Argued 7 July, decided 3 August, 1903.

## REID *v.* ALASKA PACKING CO.

[73 Pac. 337.]

43  429
e43  630
43  429
46  271

SALES — RATIFICATION OF UNAUTHORIZED ACT OF AGENT — RES GESTÆ.

1. Where an agent of a seller has exceeded his authority, declarations of the seller's officers, on receiving a memorandum of the contract, is admissible in the buyer's action for a breach, both as part of the *res gestae* and as bearing on the question of ratification.

CONTRACT VOID FOR IMPOSSIBILITY OF PERFORMANCE.

2. To excuse performance of a valid and lawful contract, made upon a sufficient consideration, it must appear obviously impossible of performance in the nature of things by any one, mere impossibility of execution by the promissor is not enough. To illustrate: A contract to sell salmon packed in Alaska, the fish to be "exactly like Puget Sound fancy Sockeye," is not void as stipulating for the impossible, though, so far as known, fish of that sort are not found in Alaska at the present time; for the country is known to be still unexplored, and if such fish are not there, they may be caught elsewhere and packed in Alaska.

CONTRACT OF SALE AND PURCHASE — STATUTE OF FRAUDS.

3. A contract for the sale of goods exceeding fifty dollars in value, memoranda of which, executed by a broker who represents both parties, are delivered to and retained by each, the contract being also entered in the broker's books, is not within the statute of frauds.

CONTRACT TO SELL AND BUY — EXPRESSION OF CONSIDERATION.

4. A written contract whereby one party covenants to buy and the other to sell specified goods exceeding fifty dollars in value is not within the statute of frauds, as failing to express a consideration; the mutual promises constituting considerations.

From Clatsop: THOMAS A. McBRIDE, Judge.

This is an action by Reid, Murdoch & Co., a corporation, against the Alaska Fishermen's Packing Co., also a corporation, to recover damages for a breach by the defendant of an alleged contract to sell and deliver to the plaintiff 2,500 cases of canned salmon. The plaintiff is engaged in buying and selling salmon, with its place of business in Chicago, and the defendant in packing salmon in Alaska for sale. In March, 1899, the defendant employed C. M. Webber & Co., brokers of Chicago, to act as its agent or broker in selling its salmon in Illinois and adjoining states. Frank Patton, of Astoria, was instrumental in negotiating the contract of brokerage, and, under an arrangement with Webber & Co., was to receive a

certain percentage of the commissions on the sales made by them. On April 3, 1899, Webber & Co. contracted to sell and deliver to the plaintiff for account of the defendant 2,500 cases of salmon, and forwarded to Patton at Astoria for delivery to defendant a memorandum of the contract as follows:

"Alaska Fisherman Packing Co.,
Original.
Mark Invoice Dept. 12.   No. 8364.

[10c. Rev. Stamp.]

Chicago, April 3rd, 1899.

Sold to Reid, Murdoch & Co.
For account of Alaska Fishermen Pkg Co.

Astoria, Oregon.

2500 cases 1 lb. tall fancy Sockeye Salmon at $1.00 f. o. b. Astoria, Oregon, unlabeled; allow cost of sellers labels. Quality to be equal to best Puget Sound fancy Sockeye— Price guaranteed against decline in the market up to date of shipment—Shipment to be as early as any Puget Sound Fish—Destruction of cannery or vessel with the Salmon shall cancel this contract.

Terms —— days, or cash less 1½ per cent upon arrival & approval in Chicago.

Buyers to be furnished with invoice and satisfactory delivery papers in time to make, at their option, full discount settlement.

Shipping directions to follow.

Mark invoice and each package No. "C 930 Salmon" Reid, Murdoch & Co. guaranteed against loss or damage from swells and spoils for six month from date of delivery.

C. M. Webber & Co."

Patton delivered the memorandum to the officers of the defendant, who refused to accept or confirm the contract, because the company did not pack or deal in fish of the quality specified therein, and it would not agree to furnish salmon of that kind. The contract was thereupon returned to Webber & Co., and subsequently modified by a memorandum entered into between them as defendant's agent

and the plaintiff, stipulating "that the salmon may be packed in Alaska, but shall be exactly like Puget Sound fancy Sockeye." The defendant was advised of the modification, but denies that it ever authorized or ratified the contract, or that it ever became binding on it, thus presenting one of the principal issues in the case.

The defendant had a verdict and judgment, and plaintiff appeals, assigning as error (1) the admission in evidence of the statements and declarations of the officers of the defendant, made at the time the contract was delivered to them by Patton, and (2) in instructing the jury as follows :

"Here is a contract that requires these people to produce a certain salmon to be packed in Alaska, but which are to be exactly like Puget Sound fancy Sockeye salmon. Suppose these contracts had been ratified by the acts of this company, and had led Reid, Murdoch & Co. to believe they were going to carry out the contract, then what would it amount to? If a man contracts to do a thing that is within the bounds of human possibility to accomplish, it does not matter whether he makes a hard bargain, so long as it is within the bounds of human possibility. And if it was within the bounds of human possibility for them to furnish those salmon, or if Reid, Murdoch & Co. had a right to suppose it was within the bounds of human possibility, they would have to do it. They had no business to enter into a contract, and mislead people who do not know about it, on the theory they are able to carry it out. But if two men undertake a contract that is not a human possibility, and both of them know it is not a human possibility, then the contract is void. A man cannot claim damages for the breach of a contract that he knew was absolutely impossible when he made it. One of those cases I remember when I was a school boy, where a man contracted to go from Rome to London in a day. The man that contracted to do that knew it was an impossibility to do it, and the man that contracted with him knew it was impossible. A man cannot contract, as a matter of law, to do anything that is absolutely impossible. If it was a human possibility anywhere in Alaska for these people to get fish as good as

Puget Sound fancy Sockeye, then they had to do it. If they were mistaken, and believed it was possible, and the purchasers believed it was possible, although even improbable, then they have to comply with their contract.

"Suppose Reid, Murdock & Co. knew the quality of the fish that could be packed in Alaska, and knew as a matter of fact, when they entered into this contract, that it was physically and absolutely impossible for these men to get a quality of salmon equal to Puget Sound Sockeye salmon, and with that knowledge they entered into the contract, knowing it was absolutely impossible, and there was no such salmon in Alaska, then they could not claim anything but the furnishing of the very nearest approach to that that could be packed in Alaska. But if they did not know it was an absolute impossibility, or did not know anything about it, and if these parties went into a hard contract of that kind, they would be bound by it. But if the party knew there was not any such fish there, then they could not claim anything more than what was within defendant's power to do. But if the buyer was ignorant, and did not know but what it was possible to get such salmon as that, then the company has got to do it, or pay the damages for not doing it.

"Suppose a contract like Fulton stated to the jury, to furnish a dozen grizzly bears caught in Clatsop County, and the buyer knew there wasn't a grizzly bear in the county, he could'nt claim damages because I did not furnish him the grizzly bears. But suppose a stranger came here, and did not know but what there were grizzly bears in the outskirts of Astoria, and I led him to enter into such a contract, I would have to do it, or pay damages for not doing it. Take it in this case: It is a question of fact, under all the circumstances of the case, to say whether these men in Chicago had such knowledge of the kind and quality of fish caught in Alaska, under all this testimony, as would lead them to believe, or call them to a knowledge of the fact, it was a physical impossibility to produce or comply with a contract to furnish salmon equal in quality to Puget Sound Sockeye salmon. If it was impossible, and they knew it, and contracted for it, then they cannot recover in this case. If it was an impossibility even, and they did

not know it, or even if they had reason to believe it was a human impossibility, then, so far as the contract is concerned, if it was ratified, and it was a good contract, they would not be bound by it. I think it depends first on the ratification of this contract — whether these parties ratified it; and the other proposition I have gone over."

REVERSED.

For appellant there was a brief over the names of *Frank Spittle* and *Clifton R. Thomson*, with an oral argument by *Mr. Spittle.*

For respondent there was a brief over the name of *Fulton Bros.*, with an oral argument by *Mr. G. C. Fulton.*

MR. JUSTICE BEAN, after stating the facts in the foregoing language, delivered the opinion.

1. We think that the evidence was competent as to the statements made by the officers of the defendant, when the memorandum was delivered to them by Patton, to the effect that they would not ratify or confirm the contract because the defendant did not pack or deal in salmon of the kind specified therein. It is admitted that Webber & Co. exceeded their authority in making the contract of warranty as to the quality of fish. In order to render the defendant liable thereon, it was necessary, therefore, for the plaintiff to show that it had ratified the contract, either in express terms or by silence and acquiescence. One material act in the alleged ratification was the delivery of the memorandum of the contract to defendant, thus advising it of the contents thereof. What was said at the time explaining the act of delivery and illustrating its character was competent as part of the *res gestæ*, and as tending to show the want of an express ratification: 1 Greenl. Ev. (15 ed.), § 108; *Feagon* v. *Cureton*, 19 Ga. 404; *Wetmore* v. *Mell*, 1 Ohio St. 26 (59 Am. Dec. 607); *Fischer Leaf Co.* v. *Whipple*, 51 Mo. App. 181; *Currier* v. *Boston & Maine R. Co.* 34 N. H. 498.

*43 Or.—28*

2. The instruction that an agreement to do something which both parties know at the time to be physically impossible cannot be enforced is sound as an abstract proposition of law. "A mutual undertaking between parties," says Mr. Bishop, "to do what both know to be impossible, is vain and idle, lacking the elements of contract, and no suit can be maintained thereon": Bishop, Cont. § 579. And Mr. Clark says: "A promise to do something which is either impossible in law or physically impossible is no consideration": Clark, Cont. 181. Before one can be excused, however, from the performance of a valid contract, deliberately entered into, because of the impossibility of performance, it must appear that the thing agreed to be done is impossible upon its face, and cannot, by any means, be effected. It is no excuse for the nonperformance of a contract that it is impossible for the obligor to fulfill it, if the performance be in its nature possible. " If the covenant be within the range of possibility," says Mr. Chief Justice NELSON, "however absurd or improbable the idea of the execution of it may be, it will be upheld — as where one covenants it shall rain to-morrow, or that the Pope shall be at Westminster on a certain day. To bring the case within the rule of dispensation, it must appear that the thing to be done cannot by any means be accomplished ; for, if it is only improbable, or out of the power of the obligor, it is not in law deemed impossible. * * If a party enter into an absolute contract without any qualification or exception, and receives from the party with whom he contracts the consideration of such engagement, he must abide by the contract, and either do the act or pay damages ; his liability arising from his own direct and positive undertaking ": *Beebe* v. *Johnson*, 19 Wend. 500 (32 Am. Dec. 518).

There is a marked distinction, not to be overlooked in this connection, between a mere disability or inability of

a party to perform a contract and the absolute and inherent impossibility of performance in the true sense.   Thus, it is a defense to an action on a contract for the sale of specific property that the property had ceased to exist when the contract was entered into, or had perished or been destroyed before the time of performance, because in that event performance is physically impossible : *Dexter* v. *Norton*, 47 N. Y. 62 (7 Am. Rep. 415); *Wells* v. *Calnan*, 107 Mass. 514 (9 Am. Rep. 65).   A contract, however, to make and deliver a quantity of goods by a stated time, may become impossible in fact by the destruction of the vendor's mill or factory ; but that would be no excuse (*Jones* v. *United States*, 96 U. S. 24 ; *Booth* v. *Spuyten Duyvil Mill Co.* 60 N. Y. 487), unless, perhaps, the agreement was to produce or manufacture the goods in the vendor's own mill which had been destroyed : *Howell* v. *Coupland*, L. R. 9 Q. B. 462.   Unless an act is inherently impossible within itself, a contract to do it is binding, although the performance may be improbable, or even impossible, to the promisor.   To excuse performance, the impossibility must be something more than merely a great inconvenience, hardship, or even impracticability.   "If one, for a valid consideration, promises another to do that which is in fact impossible," says Mr. Parsons, "but the promise is not obtained by actual or constructive fraud, and is not, on its face, obviously impossible, there seems no reason why the promisor should not be held to pay damages for the breach of the contract; not, in fact, for not doing what cannot be done, but for undertaking and promising to do it": 2 Parsons, Cont.(7 ed.)*673.   Mr. Clark says that the thing agreed to be done must be impossible on its face, not merely improbable, or impossible to the promisor : Clark, Cont. § 181. And Mr. Chitty, that it must be "naturally impossible": 1 Chitty, Cont. (11 Am. ed.) 64.   The doctrine is well illustrated by the early case of *Thornborow* v. *Whitacre*, 2 Raym.

1164. In that case the defendant, for a valuable consideration, promised to deliver to the plaintiff two grains of rye corn on a certain Monday, and to double the quantity in geometrical progression on each succeeding Monday for a definite time. It was insisted that the agreement was void, and impossible of performance, because there was not enough rye in the world with which to comply therewith. In support of this proposition it was argued that there were three sorts of impossibilities which excuse a party to a contract from its performance: (1) An impossibility in law; (2) a natural impossibility, preventing performance from the nature of the thing; and (3) impossibility in fact, although there be no inherent impossibility in the nature of the thing stipulated to be performed. But the court overruled the defense, Mr. Chief Justice HOLT saying that, where a man will, for a valuable consideration, undertake to do an impossible thing, though it cannot be performed, yet he shall answer in damages, and that the impossibility urged in the case was only impossible in fact and with respect to the defendant's ability, which was not such an impossibility as would make the contract void.

The rule to be deduced from the authorities is that, if one enters into a valid contract, for a sufficient consideration, to do a lawful thing, possible in itself — that is, in the nature of things — to be done, he must either carry out the contract according to its terms or answer in damages for a failure to do so. The mere impossibility of performance in fact will not be enough, but the contract must be obviously impossible upon its face before such a defense can be made: *The Harriman*, 76 U. S. (9 Wall.) 161. Now, applying this rule to the contract under consideration, it cannot, we think, be held that the packing of salmon in Alaska "exactly like Puget Sound fancy Sockeye" is inherently impossible. It will be readily conceded that salmon

of this class can be packed in Alaska if they can be found there, and, even if they cannot be found there, they can be taken there and packed ; hence it is clearly possible to pack them in Alaska.  But, going further, and assuming that the contract contemplates that the salmon were to be both caught and packed in Alaska (although it is not so stipulated), yet the performance is not so physically or obviously impossible as to be an excuse for failing to comply with the contract.  The waters and bays of Alaska cover many thousands of miles, and a very large part is undeveloped and unexplored.  Even if heretofore no salmon have been found in the waters of that country exactly like the Puget Sound fancy Sockeye, it furnishes no proof that they are not there, or cannot be taken there and packed. Impossibility of performance, as a defense, does not rest nor can it be based upon a mere improbability, or even an impossibility in fact, but it must appear on the face of the contract and from its nature that the performance is absolutely and physically impossible ; otherwise the contract must be held valid and binding.  The defendant was engaged in the business of packing salmon in Alaska, and knew, or should have known, whether it was possible for it to comply with the contract.  If, with this knowledge, it deliberately stipulated to furnish to the plaintiff a certain quality of fish, it must live up to its contract, or answer in damages for a failure to do so ; nor can it urge as a defense the mere impossibility of performance.  It was error, therefore, to give the instruction complained of, because it was not applicable to the contract under consideration.

3. It is argued, however, that the error was harmless, for the contract itself is invalid, because (1) it is unilateral, and not binding upon plaintiff, and (2) it is an agreement for the sale of personal property at a price in excess of $50, and does not express a consideration.  Neither of these points was made in the court below, and it is probable that

all the evidence bearing on the validity of the contract from this point of view was not given at the trial. It is doubtful, therefore, whether we should now consider the question suggested. Enough does appear, however, to show that the contract was made by a firm of brokers, probably acting as the agents of both parties — of the defendant to sell, and of the plaintiff to buy. The memorandum delivered by them to the defendant through Patton is in form a sold note. It is probable they delivered a bought note to the plaintiff, and entered the contract in their books. If so, their signature was the signature of both parties, and, if the notes were retained without objection by such parties, the contract is mutually binding upon them, and is a good contract of sale and purchase : *Butler* v. *Thomson*, 92 U. S. 412; Benjamin, Sales (7 ed.), § 277; Browne, Stat. Frauds (4 ed.), § 351; 4 Am. & Eng. Ency. Law (2 ed.), 751.

4. This view disposes of the other question, because the promise of the plaintiff to purchase was a good consideration for the promise of the defendant to sell, and therefore the contract does express a consideration : Bishop, Cont. § 76. The judgment of the court below is reversed, and a new trial ordered.        REVERSED.