## Richmond.

## LEHIGH PORTLAND CEMENT COMPANY V. VIRGINIA STEAM-SHIP COMPANY.

### March 16, 1922.

1. BILL OF PARTICULARS—*Notice of Motion for Judgment—Sufficiency—Defendant's Course Where Bill of Particulars Insufficient.*—In the instant case defendant assigned as error the action of the trial court in overruling its motion to reject the plaintiff's bill of particulars. Not only was the bill of particulars full enough to give the defendant notice of every item of its claim, but the notice of motion also contained a detailed statement of the plaintiff's claim. If the bill of particulars was insufficient, the defendant might have moved the court to reject any evidence offered by the plaintiff touching any matter not described in its notice or other pleading so plainly as to give notice of its character. This it did not do.

   *Held:* There was no merit in this assignment of error.

2. SHIPS AND SHIPPING—*Action by Steamship Company for Breach of Contract of Carriage—Damages—Idleness of Boat—Case at Bar.*—In an action by a steamship company for breach of a contract for the carriage of 40,000 barrels of cement, defendant moved the court to strike out all evidence tending to show any damage to plaintiff by reason of the idleness of its boat. Defendant had informed the steamship company that there were six to ten more cars to come forward, and these shipments were scattered through a period of several months. The steamship company was kept in idleness waiting for the arrival of these cars.

   *Held:* That if the defendant did not desire plaintiff to hold itself in readiness to transport the remaining cars of cement immediately upon their arrival at the point of shipment, in accordance with the contract, it should have so informed plaintiff, and discharged it from liability under the contract. Therefore, the evidence was clearly admissible.

3. CONTRACTS—*Impossible Contracts—Contract not Inherently Impossible—Contract Depending on Act of Third Party.*—The rule appears to be that if one undertakes unconditionally to perform

17

an act which is not inherently impossible, but merely requires the acquiescense or consent of a third party, or the performance of a preceding act by the latter, the nonperformance is not ordinarily excused by the fact that it subsequently proves impossible for the promisor to comply with the contract, because of the refusal of the third party to give his consent or perform the act; in other words, the contract will not, merely from the fact that acquiescence in or performance of an act by a third party must precede compliance therewith, be construed as conditional upon such acquiescence or performance.

4. CONTRACTS—*Impossible Contracts—Subsequent Impossibility.*—A man may, by an absolute contract, bind himself to perform things which subsequently become impossible, or to pay damages for the nonperformance; and this construction is to be put upon an unqualified undertaking where the event which caused the impossibility was or might have been anticipated and guarded against in the contract.

5. CONTRACTS—*Breach—Damages—Unreasonable Delay — Profit — Performance Prevented by Defendant.*—A plaintiff may recover damages sustained by him for loss resulting from unreasonable delay on the part of the defendant in permitting him to perform his contract, and, when he has been prevented by the defendant from completely performing his contract, he may also recover the profit he would have realized if he had been permitted to perform fully. This is not a double recovery.

6. DAMAGES—*Object of Law in Awarding Damages.*—The object of the law is awarding damages is to make amends, or reparations, by putting the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed.

7. CONTRACTS—*Impossible Contracts—Contract Not Inherently Impossible—Contract Depending on Act of Third Party—Case at Bar.*—In the instant case, an action by a steamship company against a shipper for breach of contract, the basis of the contract was the transportation of 40,000 barrels of cement. The cement was in existence and defendant had agreed to ship and plaintiff had agreed to carry it, and defendant cannot be excused from the performance of his contract because of the lawful interference of a third party, the United States, which cancelled its contract, as it had a right to do for the work upon which the cement was to be used, plaintiff having no knowledge of the terms of the government contract. If defendant intended to rely on such excuse, it should have qualified its contract with plaintiff so as to make the excuse available.

8. CONTRACTS—*Assumption of Contract by Another—Sufficiency of Evidence to Show Assumption.*—Plaintiff, a steamship company, sought to recover damages from defendant, a cement company, for defendant's breach of a contract of shipment of cement. Plaintiff alleged that the contract of shipment was made with the predecessor of defendant and assumed by defendant. Defendant contended that there was no evidence to prove the assumption of the contract by it. Defendant's officers took up the contract where its alleged predecessor left it, and conducted all correspondence in its own name, made payment of amounts due under the contract at the rates therein stated, and when the claim was asserted against it defendant failed to suggest that the liability, if any, was against its alleged predecessor.

   *Held:* That the evidence was sufficient to warrant the jury in holding that defendant had assumed the obligations of the contract of its predecessor.

9. CARRIERS—*Action by Carrier for Breach of Contract of Shipment —Damages not Excessive—Case at Bar.*—In the instant case, an action by a steamship company for a breach of contract of shipment by defendant, it appeared that plaintiff's boat was kept idle two-thirds of the time from July to November, waiting the arrival of the last shipment, during which time overhead expenses were in excess of what they would have been if the transportation had gone forward according to contract. Defendant's failure to release plaintiff from the contract prevented plaintiff from seeking other business. Only fuel and oil were saved while the boat was idle, approximately about $307. Plaintiff's claim, with interest, was $9,019.54. The jury returned a verdict for only $7,854, without interest.

   *Held:* That the damages were not excessive.

Error to a judgment of the Circuit Court of the city of Richmond in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Page & Leary,* for the plaintiff in error.

*Frank T. Sutton, Jr.,* for the defendant in error.

WEST, J., delivered the opinion of the court.

The Virginia Steamship Company, hereafter called steamship company, recovered a judgment against the Lehigh Portland Cement Company for $7,854, and the defendant thereupon obtained a writ of error.

The material facts and circumstances out of which the litigation arose are, substantially, as follows:

On the 24th day of June, 1918, the United States government entered into a contract with F. W. Mark Construction Company, Inc., to construct and complete at the fuel-oil station at Yorktown, Va., twelve re-enforced concrete oil reservoirs, which contract contained a clause permitting the United States government to curtail the amount of the work under the contract, under cetrain conditions. The F. W. Mark Construction Company entered into a contract with the Virginia Portland Cement Company (the predecessor of the Lehigh Portland Cement Company), to furnish it cement for this work. The steamship company had no knowledge of the terms of this contract. Afterwards, the Virginia Portland Cement Company made a contract with the steamship company to transport the cement from West Point, Va., to Yorktown, Va., the contract providing that the steamship company should unload the cars at West Point, and that the cement company was to furnish labor to unload the steamer at Yorktown.

The original contract was for the carriage of 10,000 barrels of cement, which was afterwards increased to 40,000 barrels. The freight charge agreed upon was 16¾ cents per hundred pounds. This contract appears from certain letters and telegrams filed as evidence in the case, being consummated in the letter from the steamship company to the Virginia Portland Cement Company, dated November 5, 1918.

The Virginia Portland Cement Company began the ship-

ment of cement, and the steamship company transported it, in accordance with the terms of the contract.

In its letter of April 22, 1919, the Lehigh Portland Cement Company, acting through the same officers who had acted for the Virginia Portland Cement Company, approved a bill in favor of the steamship company and promised to send check, and from that time on made the shipments of the cement and conducted all correspondence in regard to the movement of the cement and payments for same, and made payments as per the original contract.

These officers acted for the Lehigh Portland Cement Company without explanation, and in July, 1919, wrote that they were unable to advise as to when balance of cement would be shipped, but stated that Mark Construction Company would need six to ten cars more to complete the work.

The steamship company wrote the Lehigh Portland Cement Company on July 28, 1919, that it had been informed that the shipment of the residue of the 40,000 barrels of cement to Yorktown would be discontinued, and advised it that under the terms of the contract with its predecessor (Virginia Portland Cement Company), it had a definite contract to transport 40,000 barrels, and informing the cement company that the steamship company would make claim against the Lehigh Portland Cement Company for freight on approximately 15,000 barrels which had not been hauled, 26,924 barrels having been hauled and paid for. The Lehigh Portland Cement Company replied to this letter, but did not deny that it was the successor of the Virginia Portland Cement Company, nor deny its liability for freight on the cement which had not been shipped. Its letter stated that it was not fully informed as to the suspension of the construction at Yorktown and would go into the situation in detail and communicate with the steamship company further at an early date. They failed to communicate further with the steamship company until No-

vember 4, 1919, and the last few shipments were scattered through a period of about four months—from July to November, 1919.

[1] The assignments of error involve the action of the trial court in overruling the defendant's motion to reject the plaintiff's bill of particulars of its claim, in giving and refusing instructions, in refusing to strike out certain evidence, and in refusing to set aside the verdict of the jury and award a new trial on the ground of misdirection of the jury by the court, that the verdict was contrary to the law and the evidence, and that the damages are excessive.

Not only is the bill of particulars full enough to give the defendant notice of every item of its claim, but the notice of motion also contained a detailed statement of the plaintiff's claim. If the bill of particulars was insufficient, the defendant might have moved the court to reject any evidence offered by the steamship company touching any matter not described in its notice or other pleading so plainly as to give notice of its character. This it did not do, and it is manifest that the matters in evidence were plainly described in the notice of motion and bill of particulars. There is no merit in this assignment of error.

[2] At the conclusion of the evidence, the defendant moved the court to strike out all of the evidence in the cause which was introduced over its objection, tending to show any damage to the plaintiff by reason of the idleness of its boat subsequent to July 25, 1919. The action of the court in overruling this motion is also excepted to by the plaintiff in error.

The contract between the cement company and the steamship company required the latter to transport 40,000 barrels of cement from West Point to Yorktown and to unload same from the cars and take it to Yorktown whenever the shipments arrived at West Point. The Lehigh Portland Cement Company had informed the steamship company

that there were six to ten more cars to come forward to complete the work, and these shipments were scattered through a period of several months. The steamship company was kept in idleness waiting for the arrival of these cars. If the cement company did not desire the steamship company to hold itself in readiness to unload and transport to Yorktown the remaining six to ten cars of cement immediately upon its arrival at West Point, in accordance with the terms of the contract, it should have so informed the steamship company, and discharged it from liability under the contract. We think the evidence was clearly admissible.

[3] The defendant's main ground of defense is that, "even though the contract were entered into and assumed by the Lehigh Portland Coment Company, the parties, and particularly the defendant, were, prior to the institution of this suit, and are now discharged and excused from performance of the same, because of supervening impossibility of performance and frustration of adventure by the act of the United States government in canceling its contract with the F. W. Mark Construction Company and prohibiting the further construction of the government work thereunder. This contention will be disposed of in the consideration of the remaining assignments of error.

The following instructions were granted by the court:

1. (Requested by the plaintiff.) "The court instructs the jury that the letters and telegrams that passed between the plaintiff and the Virginia Portland Cement Company, mentioned in the notice of motion and introduced in evidence, contain the terms of the original contract involved in this suit; and if the jury believe from the evidence that the Lehigh Portland Cement Company afterwards succeeded to the business of the Virginia Portland Cement Company and continued to ship cement to the F. W. Mark Construction Company at Yorktown, to be carried by the plaintiff company from West Point, Va., to Yorktown, Va., and con-

tinued to pay the plaintiff for carrying the same at the same rates the Virginia Portland Cement Company had been paying, and treated said contract as its own, then the defendant company, by such conduct, undertook and assumed the obligations originally undertaken by the Virginia Portland Cement Company and became bound thereby to ship the full among and pay the price therefor agreed upon in the original contract."

2. (Requested by plaintiff, amended by court.)   "The court instructs the jury that if they believe from the evidence that the plaintiff made a contract with the Virginia Portland Cement Company to carry for said company 40,-000 barrels of cement at 16¾ cents per cwt., as charged in the notice of motion, and that subsequently the Lehigh Portland Cement Company succeeded to the business of the Virginia Portland Cement Company and assumed and undertook to carry out said contract, but failed to carry out its part by delivering to the plaintiff for carriage by it all of the 40,000 barrels of cement and failed to pay the plaintiff all of the sum of $25,460.00, the entire contract price for such carriage, then the defendant was guilty of a violation of its contract to the extent it did not deliver to the plaintiff for carriage from West Point, Va., to Yorktown, Va., the 40,000 barrels of cement, and to the extent that it did not pay therefor at the rate of 16¾ cents per cwt.   Provided you shall further believe from the evidence that the plaintiff was always ready and willing to perform its part of said contract."

3. (Requested by plaintiff, amended by court.)   "The court instructs the jury that, should they believe from the evidence there was such a contract and breach thereof, causing damage as charged in the notice of motion for judgment in this cause, it, nevertheless, became incumbent upon the plaintiff to make reasonable efforts to minimize the damage done it by such breach.   But this duty did not

arise and become incumbent upon the plaintiff until noti-
fied by the defendant company or it was reliably informed
from other reliable sources that it would not carry out its
said contract; and so long as the defendant company al-
lowed the plaintiff to remain in doubt as to whether the
defendant company would continue to ship cement as per
its contract, there was no duty upon the plaintiff company
to seek similar employment from other sources in order to
minimize, unless you shall believe from the evidence that,
as a matter of fact, the plaintiff, from other reliable sources,
knew that the defendant would not carry out its contract."

4. (Requested by plaintiff.)   "The court instructs the
jury that there is no evidence in this case that either the
government of the United States or the F. W. Mark Con-
struction Company was a party to the contract; and, al-
though the jury may believe from the evidence that the
United States government canceled its contract with the
F. W. Mark Construction Company, yet that fact did not
release the defendant company from its contract made with
the plaintiff."

5. (Requested by defendant.)   "The court instructs the
jury that the burden of proof rests upon the plaintiff in
this case to establish by a preponderance of the evidence
the contract alleged by it, the alleged breach by the defend-
ant, and to establish with reasonable certainty the amount
of the damages actually suffered by it by reason of the al-
leged breach."

6. (Given by the court.)   "The court instructs the jury
that in case of breach of contract, the broad general rule
is that the party injured is entitled to recover all his dam-
ages, including gains prevented as well as losses sustained
by reason of the breach of contract, that this rule is sub-
ject to but two conditions:   The damages must be such as
may fairly be supposed to have entered into contemplation
of the parties when they made the contract; that is, must

be such as may naturally be expected to follow its violation, and they must be certain both in their nature and in respect to the cause from which they proceed."

"The court further instructs the jury if they should find for the plaintiff in this case, the measure of damages is the value of the bargain to the plaintiff or the loss which the fulfillment would have prevented or which the breach has entailed, the intent of the law is to put the injured party, so far as can be done by money, in the same position as if the contract had been performed; therefore, the measure of damages for the breach of such a contract as that sued upon in this case is the difference between the contract price remaining unpaid and the cost of delivery."

The following instructions were refused by the court:

"Certificate No. II.—The court instructs the jury that if they believe from the evidence that at the time this contract was entered into both parties thereto assumed under all the circumstances and conditions then existing, as the basis of their agreement, even though not expressly provided in their contract, the continuance of the government work at Yorktown for which the cement was to be furnished, and that it may be fairly implied that both parties assumed that the performance of their contract was based upon the continued existence of this government work, and that this work was discontinued by the government without fault on the part of the defendant, then the court instructs the jury that there has been no breach of this contract for which the defendant is liable to the plaintiff, and they should find for the defendant."

"Certificate No. III.—The court instructs the jury that if they believe from the evidence that the defendant in this case violated the contract existing between it and the plaintiff without excuse for so doing, as is explained in instruction No. ——, they must find for the plaintiff, and that the measure of damages is the difference between the con-

tract price remaining unpaid, to-wit: $8,354.00, and the cost the plaintiff would have been put to in performing the contract, and that in estimating this cost they must take into consideration the length of time it would have required the plaintiffs to haul the cement remaining undelivered under the terms of the contract, the costs and expenses of operating the boat during this time, including the salaries of officers, the wages of the crew, the cost of feeding the crew, fuel, sundry expenses, insurance, interest charges, loss and damage and taxes, but in so doing the jury are instructed that they must apportion such expenses between the transportation of the unshipped cement and the other business done by the plaintiff during the said period."

"The court further instructs the jury that the evidence of the said costs and expenses during the period in which the plaintiff was engaged from September 1, 1918, to July 28, 1919, in hauling the cement delivered to it under the contract, may be considered by it in arriving at the plaintiff's costs and expenses in transporting the undelivered portion of the cement."

"Certificate No. IV.—The court instructs the jury that should they find for the plaintiff, then the measure of its damages is the difference between the contract price for carrying the cement remaining unpaid and the additional cost it would have been put to had it actually carried the cement, instead of lying at the wharf ready and waiting to carry, provided you shall believe from the evidence that such was the case."

In L. R. A. 1916F, at page 48, it is said: "The rule appears to be that if one undertakes unconditionally to perform an act which is not inherently impossible, but merely requires the acquiescence or consent of a third party, or the performance of a preceding act by the latter, the nonperformance is not ordinarily excused by the fact that it subsequently proves impossible for the promisor to com-

ply with the contract, because of the refusal of the third party to give his consent or perform the act; in other words, the contract will not, merely from the fact that acquiescence in or performance of an act by a third party must precede compliance therewith, be construed as conditional upon such acquiescence or performance. Thus, it has been held that one contracting to construct a canal on certain lands is not excused from performance by inability to obtain from the landowners the right to construct the canal on their lands."

In *Dannenhower* v. *Hayes,* 35 App. D. C., at page 57, 33 L. R. A. (N. S.), at page 702, this is stated: "This is simply a case of the appellant's undertaking to do a perfectly lawful thing which he was unable to perform. Such contracts, in the absence of fraud, are enforceable. In 2 Parsons on Contracts, page 673, it is said: 'If one, for a valid consideration, promises another to do that which is, in fact, impossible, but the promise is not obtained by actual or constructive fraud and is not on its face obviously impossible, there seems no reason why the promisor should not be held to pay damages for the breach of the contract; not, in fact, for not doing what cannot be done, but for undertaking and promising to do it (cases cited). So, if it becomes impossible by contingencies which should have been foreseen and provided against in the contract, and still more, if they might have been prevented, the promisor should be held responsible. So, if the impossibility applies to the promisor personally, there being no natural impossibility in the thing, this will not be a sufficient excuse.' Such contracts, when fairly and honestly made, are enforceable."

To the same effect is *Van Etten* v. *Newton,* 15 Daly 542, 29 N. Y. S. R. 411, 8 N. Y. Supp. 478, and *Cobb* v. *Harmon,* 23 N. Y. 148.

In L. R. A. 1916F, page 31, it is said: "It is well

settled, as a general rule, that if performance is rendered merely difficult or burdensome or unprofitable, the promisor is not excused; and the same is true generally if the impossibility is personal to the promisor, and does not inhere in the nature of the act to be performed. On the latter point, it was said in Oregon case, *Reid* v. *Alaska Packing Co.*, 43 Or. 429: "It is no excuse for the nonperformance of a contract that it is impossible for the obligor to fulfill it, if the performance be in its nature possible. * * * There is a marked distinction, not to be overlooked in this connection, between a mere disability or inability of a party to perform a contract and the absolute and inherent impossibility of performance in the true sense. * * * unless an act is inherently impossible within itself, a contract to do it is binding, although the performance may be improbable, or even impossible, to the promisor. To excuse performance, the impossibility must be simply more than merely a great inconvenience, hardship, or even impracticability." *American Towing & Lightering Co.* v. *Baker-Whiteley Coal Co.* (1912), 117 Md. 660, 84 Atl. 182, Ann. Cas. 1914A 146; *Ward* v. *Haren* (1909), 139 Mo. App. 8, 119 S. W. 446; *Howell* v. *National Portland Cement Co.*, 9 Northampton Co. Ct. Rep. (Pa.) 108; *Jenkins* v. *Wheeler* (1867), 42 N. Y. (3 Keyes) 645.

[4] In 6 Ruling Case Law, page 1000, we find this statement: "Where performance is thus rendered impossible, the inquiry naturally arises whether there was a purpose to covenant against such an extraordinary and, therefore presumably, unapprehended event, the happening of which it was not within the power of the covenanter to prevent. In other words, there can be no doubt that a man may, by an absolute contract, bind himself to perform things which subsequently become impossible, or to pay damages for the nonperformance; and this construction is to be put upon an unqualified undertaking where the event which caused

the impossibility was or might have been anticipated and guarded against in the contract  *  *  *."

In 6 Ruling Case Law, page 1014, section 375, we find this: "Act of third party.—Generally speaking, it may be said that where a party undertakes expressly for the performance of some act, his positive engagement casts upon him a duty, the discharge of which cannot be excused by showing his inability by reason of the lawful interference of some third person. By neglecting to qualify his contract, so as to make such an excuse available, he waives it as a defense against a recovery of damages for nonperformance.  *  *  *  A promise may, of course, be conditioned upon the act or consent of a third person. But the performance of an absolute promise is not excused by the fact that a third person refuses or fails to take action essential to performance  *  *  *  The nonperformance of a contract ordinarily is not excused by the mere fact that the promisor has no control over the third person."

[5, 6] In the case of *Alleghany Iron Co.* v. *Teaford,* 96 Va. 378, 31 S. E. 525, it is held that a plaintiff may recover damages sustained by him for loss resulting from unreasonable delay on the part of the defendant in permitting him to perform his contract, and, when he has been prevented by the defendant from completely performing his contact, he may also recover the profit he would have realized if he had been permitted to perform fully. This is not a double recovery. The object of the law in awarding damages is to make amends, or reparations, by putting the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed.

The plaintiff in error relies with great earnestness upon the principles of law enunciated in the case of *Virginia Iron Co.* v. *Graham,* 124 Va., pp. 700, *et seq.,* 98 S. E. 659, as being applicable to the facts in the instant case. But

this case is easily distinguishable from the case under consideration.

In the *Graham Case,* which involved a mining contract, the foundation of the contract was the existence of sufficient iron ore to justify the operations of the mines for forty years, and both parties assumed its existence and contracted with reference thereto.

When it appeared that the ore did not exist it was clear that each party had entered into the contract under a mistake of fact which affected the substance of the contract and the contract became inoperative for a failure of the consideration, and the lessee was plainly entitled to be relieved from the payment of the royalty provided for in the lease.

[7] In the instant case, the basis of the contract was the transportation of 40,000 barrels of cement. The cement was in existence and the cement company had agreed to ship and the steamship company had agreed to carry it from West Point to Yorktown; and the cement company cannot be excused from the performance of its contract because of the lawful interference of a third party. It should have qualified its contract so as to make this excuse available.

In view of the foregoing authorities, we find no error in the action of the court in granting or refusing instructions, of which the plaintiff in error can complain.

[8] We cannot sustain the contention of the plaintiff in error that there is no evidence to prove the assumption of the original contract by that company. The conduct of its own officers in taking up the contract where the Virginia Portland Cement Company left it, and conducting all correspondence in its own name, and the payment by it of amounts due under the contract at rates therein stated, and failure to suggest, when the claim sued on was asserted against it by the steamship company, that the liability, if any, was against the Virginia Portland Cement Com-

pany, was sufficient evidence to warrant the jury in hold-ing that the Lehigh Portland Cement Company had as-sumed the obligations of the contract of the Virginia Port-land Cement Company.

Nor can we sustain the defense of the plaintiff in error that it was and is now discharged and excused from per-formance of the contract because of supervening impos-sibility of performance and frustration of adventure by the act of the United States government in canceling its contract with F. W. Mark Construction Company, Inc.

The government was not a party to the contract sued on, and its action in curtailing the work at Yorktown simply destroyed the demand for cement at that place, without making the transportation of the cement impossible.

The steamship company, having no knowledge of the terms of the contract between the government and the F. W. Mark Construction Company, it is apparent that the continuance of the work upon the cement reservoirs at Yorktown to final completion was not the basis and im-plied condition upon which the liability of the parties to perform the contract sued on rested.

[9] Are the damages assessed by the jury excessive? It appears from the record that from July to November the steamship company was forced to keep its boat idle two-thirds of the time, waiting the arrival of the last six to ten cars of cement at West Point, during which time the company paid out for overhead expenses more than it would have paid for overhead expenses in transporting the resi-due of the 40,000 barrels of cement to Yorktown.

The failure of the cement company to release it from the contract prevented the steamship company from seeking other business.

Only fuel and oil were saved while the boat was idle, and it is in evidence that the fuel and oil used in making the

twenty round trips necessary to haul the remaining 13,200 barrels of cement would have cost approximately $307.00.

The plaintiff's claim was for $8,354.00, with interest from August 11, 1919, making a total claim of $9,019.54, the day the verdict was rendered, while the jury returned a verdict for only $7,854.00, without interest, showing they deducted for expenses over $1,100.00.

In view of the evidence, we cannot say the damages are excessive.

For the foregoing reasons, we find no error in the rulings of the trial court, or in the judgment under review, and the case will be affirmed.

*Affirmed.*