# Richmond

## John Foreman v. E. Caligari and Company, Incorporated.

April 22, 1963.

Record No. 5555.

Present, All the Justices.

The opinion states the case.

*Joseph J. Lawler (Kellam & Kellam,* on brief), for the plaintiff in error.

*Philip L. Russo (Russo & White,* on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

John Foreman instituted an action at law against E. Caligari and Company, Incorporated, hereinafter called Caligari, to recover damages in the sum of $6,000. He alleged that Caligari had breached a contract in that it had failed and refused to deliver certain airfield runway paint and "traffic beads" it had agreed to sell to him. A jury trial resulted in favor of Caligari, and we granted Foreman a writ of error to the judgment entered on the verdict.

Foreman challenges the correctness of the court's rulings in admitting certain evidence; in granting certain instructions, and in failing to set aside the verdict and award him a new trial.

The plaintiff, John Foreman, was engaged in the business of marking and painting airfield runways and parking lots. The defendant, Caligari, was a distributor of paints. William Artese was vice-president of that corporation and the manager of its store located in Norfolk.

On July 11, 1960, the United States Government mailed to certain contractors an invitation to bid on repairs to be made on the runways at Langley Air Force Base. Copies of the plans and specifications for the work were made available at the office of the contracting officer at Langley Field and at the Builders Exchange in Norfolk. There were also copies available in Newport News, Hampton and Richmond for inspection by interested parties. They contained a provision for the painting of the runways.

It was specified that either of two types of "drop-in" reflective materials was acceptable to be used in connection with the painting. One was described as "a small bead or sphere having a minimum refractive index of 1.90." The other was described as "a reflective granule."

Foreman was desirous of securing the subcontract for painting the runways and after having discussed with Artese the costs for materials he submitted a bid of 6 cents per square foot, based on an estimated 130,000 square feet, for labor and materials to two general contractors

bidding on the main project. The bids were opened on July 25, 1960, and on July 27 the contract was awarded to Williams Paving Company, Inc., for $439,059.70. In submitting its bid the company relied on Foreman's bid given over the telephone on July 23. Edward V. Williams, vice-president of Williams Paving Company, Inc., testified that Foreman's bid did not appear to him to be "out of line." The contract provided that the runway painting job was to be completed within 30 days from the notice to proceed, which was August 1st.

On or about August 2 Foreman went to Caligari and told Artese that he was the successful bidder on the painting job and gave his order for 1,145 gallons of 0085 binder (paint) and 12,600 pounds of beads with a refractive index of 1.9. The testimony of Foreman and Artese as to what transpired at this time and during previous conversations concerning the beads is in conflict and will be discussed *infra*. Artese called his supplier in Baltimore and was told that the price of 1.9 beads was 60 cents a pound. Artese advised Foreman of what the supplier had said and they both were "upset". Foreman had figured on a cost of 14 cents a pound in his bid to the general contractor. Later Artese learned that 1.9 beads were not available at the time. On August 9 he and Foreman went to see Williams who informed them that it was not his obligation to get the materials, but that it was Caligari's responsibility. From there they called on Major Ira Vance, the contracting officer for Langley Field, and Foreman asked him if there was not some provision in the law for relief where the materials were not available or the price was erroneous. Major Vance told them "all my discussions on price or anything of that nature must be made by the Williams Paving Company, that I could not deal directly with a subcontractor nor a material supplier." He stated he was looking to the general contractor to perform the contract.

After it was determined that Foreman could not secure the 1.9 beads, Williams attempted to purchase them in order to complete the job within the specified time. He contacted the Flexolite Company in St. Louis, Missouri, and because of "strike, vacations, and so forth", he was informed that the material could not be had until September 15. He then contacted the Minnesota Mining and Manufacturing Company, the only other source he knew which could produce the required beads or granules. Minnesota could not supply the 1.9 beads or granules as specified in the contract. Williams purchased from Minnesota 1075 gallons of binder paint and 1365 pounds of No. 9330 Scotch Brand reflective granules, which were approved by the

Government and Foreman completed the job. These materials cost $11,227.25 and were paid for by the Williams Company, which in turn charged Foreman. Under Foreman's bid he would have been entitled to receive the sum of $7,687.20, and after crediting that amount to his account he owed the Williams Company $3,540.05.

Foreman testified that he had used a 1.5 bead on occasions but had never used a 1.9 bead and was not acquainted with the cost of this material; that on or about July 15 he called Artese long distance and told him about the Langley Field job and was "quite sure" he gave him the invitation number; that he told Artese that the specifications called for a 1.9 bead; that he would need 12 or 13 thousand pounds of beads and 11 or 12 hundred gallons of paint, and that Artese agreed to secure prices on the materials for him. He stated that on July 18 he returned to Caligari's establishment and Artese quoted him a price of $2.49 per gallon for the paint and 14 cents per pound for the beads; that he asked him "to please check with his supplier and confirm that price that he was quoting on the 1.9 refractive index bead."

On July 23 he said he contacted Artese and was told by him that the supplier had confirmed the price on the 1.9 bead. In response to his request for a letter of confirmation, Artese wrote him, under date of July 26, as follows:

"We herewith submit the following quotation covering bid # 1FB-44-600-61-1 repair of Air Field pavement, Langley Field, Langley Air Force Base, on 1150 gallons of TTP-0085 traffic white binder @ $2.49 per gallon, F.O.B. Langley Air Force Base, Langley Field, Virginia.

"Traffic beads @ .14 per pound C.O.D.

"Traffic beads @ .16 per pound regular terms."

Foreman further testified that when he submitted his bid to the Williams Company there was no question in his mind about the price not being "right" or that the material was "available" and that his bid was based on Artese's quotation. He stated that on August 2, when he placed his order for the paint and 1.9 beads either Artese or a representative of the supplier, who was present, said "the beads were usually stock, so there wasn't any problem there"; that in the afternoon of that day he received a telephone call from Artese advising "there had been a big mistake" as a representative of the supplier told him "they checked up and found out the beads cost sixty cents a pound in St. Louis instead of the fourteen cents they quoted"; that after he and Artese had made an unsuccessful attempt to obtain re-

lief from Major Vance, he asked Artese if there was anything he could suggest to be done, to which he replied in the negative, and that he thereafter informed Williams his "source of quotation and course of supply couldn't deliver."

Artese testified that on or about July 20 he had a discussion with Foreman about "traffic beads" and paint; that after calling his supplier, he quoted a price of 14 cents per pound for the traffic beads, which was his cost; that he quoted his cost price in order to secure Foreman's paint business, and that beads with a 1.9 refractive index were not mentioned on this occasion. He said that his next conversation with Foreman was on July 26 when Foreman called and requested a letter making reference to the contract number at Langley Field and quoting prices on the paint and traffic beads, which he wrote that day; that the quotation for traffic beads mentioned in the letter was for a "standard bead" (1.5 refractive index); that the contract number was furnished him by Foreman during the conversation, and that at this time no mention was made of a 1.9 bead.

Artese further testified that on or about August 2, Foreman came to his office with a set of specifications for the Langley Field job and ordered paint and 1.9 traffic beads; that he told Foreman he did not know the price of 1.9 beads and would have to ascertain the price from his supplier in Baltimore and that after receiving information that the price was 60 cents per pound called Foreman and advised him accordingly. He denied that he was ever asked by Foreman to check prices he had quoted.

During the course of the trial, Major Vance was asked on cross-examination, over the objection of Foreman, whether Williams ever asked him for "relief" after the difference in cost of the beads and their non-availability was discovered. He replied that he did not recall any such request by Williams and that he did not have "any formal application for relief" from the Williams Company. Later, in response to a similar question, Williams said that he did not ask Major Vance for relief. The objection was made immediately after the question had been answered and no motion was made to strike his answer from the record. The basis for the objection in both instances was that the evidence was not material to the issues involved.

Foreman contends that this evidence permitted the jury to infer that it was the duty of Williams to request an amendment to the contract and that such failure was imputed to him and he was thereby prejudiced.

Caligari argues that the evidence was admissible because Foreman had "opened the door" when his witness, Major Vance, testified on direct examination that he told Foreman and Artese that he could not deal directly with a subcontractor or a material supplier as the contract was between the Government and the Williams Company.

While we do not think that the questioned evidence was material to the issues involved, we are of opinion that it was not prejudicial error to admit it.

▋ Foreman urges that the trial court erred in granting Instruction No. D-3. It reads:

"The Court instructs the jury that if from a preponderance of the evidence you believe that William Artese, the manager of the defendant corporation, made a mistake in his quotation to the plaintiff in regard to a material fact and that the plaintiff either knew, or that a reasonable person under the same circumstances should have known that a mistake had been made, then you shall find for the defendant, E. Caligari and Company, Incorporated."

It is contended by Foreman that there was no evidence to support this instruction and that it was confusing to the jury and was not a correct statement of the law.

It will be observed that the instruction has reference to a mistake on the part of Artese. He emphatically denied that he had made a mistake and no one testified that he did. Artese's testimony was that his quotation of 14 cents per pound was for a "standard bead" and not a 1.9 bead as contended by Foreman. There was, however, testimony tending to show that Artese's supplier had made a mistake.

In view of our conclusion that the evidence was not sufficient to support an instruction concerning a mistake on the part of Artese, we do not deem it necessary to consider the correctness of the form of the instruction.

▋ Foreman maintains that the trial court erred in granting Instruction No. D-4, which follows:

"The Court instructs the jury that even if you believe that the parties hereto entered into a binding contract, the plaintiff still had a duty to mitigate the damages of the defendant. If, from the evidence you believe that John Foreman did not do everything reasonable under the circumstances to keep his damages to a minimum, then you shall take this into consideration in arriving at the amount of damages, if any, which the said John Foreman is awarded."

We agree with Foreman's contention that the instruction was inapplicable, because there was no evidence upon which to base it.

"* * * Mitigation of damages is an affirmative defense, and its burden is entirely on the contract breaker. * * *." 5 M. J., Damages, § 49, p. 540. There has been no showing in the record that Foreman failed to do anything which would have avoided or mitigated his loss. The uncontradicted evidence is that after the conferences he and Artese had with Major Vance and Williams, Foreman asked Artese whether there was anything further "he wanted to do", and he replied "no". Foreman then informed him that he would have to tell Williams "you can't furnish the material" and Artese said "Okay". The Williams Company attempted to purchase the 1.9 beads but they could not be obtained in time to complete the contract on the date specified. Had Williams not used the Scotch Brand reflective granules and had thus delayed the project until delivery of the 1.9 beads or granules could be had it is most probable that the loss would have been even greater than that sustained. The instruction permitted the jury to speculate and it should not have been given.

■ Foreman also claims the trial court erred in giving Instruction No. D-5. It provides:

"The Court instructs the jury that if from a preponderance of the evidence you believe that the defendant, E. Caligari and Company, Incorporated, agreed to supply the binder and 1.9 beads required for the Government contract and if you further believe that it was impossible for the said defendant to deliver the traffic beads due to a circumstance other than a strike existing at the time of the negotiations between the parties which related to the subject matter thereof without the knowledge of either party, then you shall find for the defendant, E. Caligari and Company, Incorporated."

This instruction was objected to on the grounds that it was not supported by the evidence and that it was not a proper statement of the law applicable to the facts.

In *Lehigh, Etc., Co.* v. *Va. S. S. Co.*, 132 Va. 257, 267, 268, 111 S. E. 104, we quoted with approval the following principle of law:

"The rule appears to be that if one undertakes unconditionally to perform an act which is not inherently impossible, but merely requires the acquiescence or consent of a third party, or the performance of a preceding act by the latter, the nonperformance is not ordinarily excused by the fact that it subsequently proves impossible for the promissor to comply with the contract, because of the refusal of the third party to give his consent or perform the act; in other words, the contract will not, merely from the fact that acquiescence in or per-

formance of an act by a third party must precede compliance therewith, be construed as conditional upon such acquiescence or performance. \* \* \*" See also *Barcroft Woods* v. *Francis*, 201 Va. 405, 409, 111 S. E. 2d 512 and *Va. Iron, Etc., Co.* v. *Graham*, 124 Va. 692, 701, 98 S. E. 659.

Here, the evidence does not show that it was inherently impossible to obtain the 1.9 beads or granules. It does show that there was no cessation of the existence of the materials. In fact delivery could have been made on September 15, which was too late to finish the job by the time specified in the Government contract. Artese did not explain why the materials were not available at the time. Foreman testified that either Artese or a representative of the supplier told him when he placed his order on August 2 that "the beads were usually stock, so there wasn't any problem there." Williams testified that the Flexolite Company could not deliver at the time because of "strike, vacations and so forth." There was no evidence relating to the availability or non-availability of the materials on July 23, the date Foreman said Artese confirmed the price on the 1.9 beads and the date he submitted his bid to the Williams Company. There was no agreement to release Caligari if it could not furnish the materials. The evidence falls short of supporting Instruction No. D-5 and the giving of it constituted error.

For the reasons stated the judgment appealed from is reversed and the case is remanded for a new trial.

*Reversed and remanded.*