# CIRCUIT COURT OF THE CITY OF NORFOLK

Scott C. Harvard

v.

Shore Bank
and Hampton Roads
Bankshares, Inc.

April 30, 2014

Case No. CL13-4525-00

By Judge Charles E. Poston

This action is before the Court on the Defendants' Plea in Bar. Having considered the written submissions of counsel, the papers filed in this action, and the argument of counsel, the Court will deny the Plea in Bar.

*Background*

This case arises from an employment contract dispute between the Plaintiff, Scott C. Harvard, and the Defendants, Shore Bank ("Bank") and Hampton Roads Bankshares, Inc. ("HRB"). Harvard has brought a breach of contract action against HRB and the Bank for failing to pay him his contracted severance allowance.

Harvard was the President of Shore Bank and Executive Vice President of operations for HRB in Delaware, Maryland, and Virginia. Shore Bank is a corporation organized under Virginia law, and HRB is Shore Bank's parent company. On January 8, 2008, HRB, the Bank, and Harvard entered into an employment agreement, under the terms of which Harvard was entitled to terminate his employment with the Bank within six months of a "change in control." According to the agreement, a change in control occurs when "any one person, or more than one person, acting as a group, acquires ownership of stock of the Parent Company (HRB) possessing 30% or more of the total voting power of the stock." Upon termination, "[t]he Employer shall pay the Officer a severance allowance in sixty (60) equal monthly payments commencing on the last day of the month in which the Date of Termination occurs, *the total amount of which will equal 2.99 times*

*(2.99x) the base amount.*" (Emphasis added.) Harvard's contracted annual base salary was $250,000.00. In addition, Harvard was entitled to certain health and insurance benefits following his resignation.

In the wake of the financial crisis of 2008, Congress passed the Emergency Economic Stabilization Act of 2008 ("EESA") which included the Troubled Asset Relief Program ("TARP"). Emergency Economic Stabilization Act, 12 U.S.C. 52 (2008). TARP granted the Secretary of the Treasury ("Secretary") the authority to purchase troubled assets from financial institutions in order to provide liquidity to such institutions. *Id.* §§ 5201, 5211. The EESA also gave the Secretary authority to set limits on executive compensation for the "senior executive officers" ("SEO") of financial institutions selling troubled assets to the Secretary. Emergency Economic Stabilization Act, Pub. L. No. 110-343, § 111, 122 Stat. 3776-77 (2008). Specifically, EESA gave the Secretary authority to prohibit a financial institution from making any "golden parachute payment to its senior executive officer during the period that the Secretary holds an equity or debt position in the financial institution." *Id.* at 3776-77(b)(2) (C). On October 20, 2008, the United States Department of the Treasury ("Treasury") issued an interim final rule ("October Rule") stating:

> a golden parachute payment means any payment in the nature of compensation to (or for the benefit of) an SEO made on account of an applicable severance from employment to the extent the aggregate present value of such payments equals or exceeds an amount equal to three times the SEO's base amount.

31 C.F.R. § 30.9 (2008) (internal quotations omitted).

On December 31, 2008, HRB entered into a Securities Purchase Agreement with Treasury and received TARP funds under the Capital Purchase Program ("CPP"). In conjunction with the Securities Purchase Agreement, Harvard, on the same date, signed a letter agreement with HRB establishing the specific standards for executive compensation while HRB participates in the CPP. In that letter, Harvard agreed that he could not receive any golden parachute payment during any CPP covered period. The letter agreement explained that the term "golden parachute is used with the same meaning as in Section 111(b)(2)(C) of EESA" and the October Rule, which limits compensation to three times the base amount. As of the date of the signing of the letter agreement, HRB, the Bank, and Harvard were in agreement that his total severance compensation did not violate the October Rule because it was limited to 2.99 times his annual base amount. Nevertheless, the letter agreement meant that Harvard agreed to a reduced severance package. Under the employment agreement, Harvard was entitled to 2.99 times his annual base amount, calculated as the annualized includible

compensation for the preceding three taxable years. The October Rule defined the base amount as the average annualized includible compensation for services performed in the five years preceding the change in control. 26 C.F.R. § 1.280G-1 (2008). In order to comply with the federal regulations, Harvard also signed a document in which he waived "any claim against the United States or [his] employer for any changes to [his] compensation or benefits that are required to comply with the [October Rule]."

On December 31, 2008, the shareholders of Gateway Financial Services acquired 39% of HRB's outstanding voting shares. The purchase constituted a change in control as defined in Harvard's employment agreement. As of the date of the purchase, Harvard had six months to terminate his employment.

On February 17, 2009, Congress enacted the American Recovery and Reinvestment Act of 2009, amending the definition of golden parachute to mean "any payment to a senior executive officer for departure from a company for any reason, except for payments for services performed or benefits accrued." Pub. L. No. 111-5, § 7001, 123 Stat. 517 (2009). Treasury issued a more detailed interim final rule on June 15, 2009 ("June Rule"), which states:

> The term golden parachute payment means *any* payment for the departure from a TARP recipient for any reason, or *any payment due to a change in control of the TARP recipient* or any entity that is included in a group of entities treated as one TARP recipient, except for payments for services performed or benefits accrued.

31 C.F.R. § 30.1 (2009) (emphasis added).

On June 24, 2009, Harvard terminated his employment as a result of the change in control event that occurred on December 31, 2008. The termination was within six months of the change in control event, as required by the Employment Agreement. As a result, Harvard requested payment of his contracted severance compensation. After consulting Treasury, HRB and the Bank, acting in reliance on the June Rule, refused to pay Harvard his contracted compensation.

Harvard subsequently filed this breach of contract action and alleged in Count I that HRB and the Bank are contractually obligated to pay him the compensation. He seeks damages of $750,000.00 plus interest. In Counts II through IV, Harvard alleges breach of contract for HRB and the Bank's failure to pay fees for previous breach of contract and declaratory judgment actions. In response, HRB and the Bank filed a Plea in Bar to Count I and a Demurrer to Count II. The Court overruled the Demurrer by order dated December 4, 2013. In support of their Plea in Bar, the Defendants argue that, as TARP fund recipients, they are legally prohibited from making any severance payment to Harvard in accord with Treasury's June Rule.

Conversely, Harvard argues that the American Recovery and Reinvestment Act, amending the EESA, and Treasury's subsequent June Rule, prohibiting payment of his contracted severance compensation, is a taking of his private property without just compensation in violation of the Fifth Amendment to the United States Constitution.

## Discussion

A plea in bar is a defensive pleading that reduces the litigation to a single issue which, if proven, creates a bar to the Plaintiff's right to recovery. *See, Kroger Co. v. Appalachian Power Co.*, 244 Va. 560, 562, 422 S.E.2d 757, 758 (1992). The "issue raised by a plea in bar may be submitted to the . . . court for decision based on a discrete body of facts identified by the parties through their pleadings, or developed through the presentation of evidence supporting or opposing the plea." *Holmes v. Reid*, 80 Va. Cir. 514, 519 (2010) (citing *Hawthorne v. VanMarter*, 279 Va. 566, 577-78, S.E.2d 226, 233-34 (2010)). The party asserting a plea in bar carries the burden of proof. *See, Tomlin v. McKenzie*, 251 Va. 478, 480, 468 S.E.2d 882, 884 (1996). In the case at bar, the parties stipulated to the admission of the applicable documents. Briefs were submitted, and oral argument was heard on December 4, 2013.

HRB and the Bank's Plea in Bar presents the narrow issue of whether application of the June Rule to Harvard's requested severance compensation is a bar to Count I. Harvard concedes his contracted compensation is the type contemplated in and prohibited by the June Rule. Nonetheless, he contends that application of the June Rule to his severance compensation is unconstitutional "as applied" to him. He argues that the June Rule is not simple regulation of banking, but the federal government's acting to protect its investment retroactively. Application of the June Rule is specifically targeted at his contract rights he says, resulting in an unconstitutional taking of his private property for which he is entitled to just compensation.

### Fifth Amendment Taking

The federal government has the authority to take private property when necessary. However, the Fifth Amendment to the Constitution places a limit on that power. The Amendment states: "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." U.S. Const., amend. V.

What constitutes a taking for purposes of the amendment, however, has been difficult to determine: "[The United States Supreme Court], quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately

concentrated on a few persons." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (citations omitted).

The Supreme Court, nevertheless, has consistently found contract rights to be private property. In *Lynch v. United States* the Court stated that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States." 292 U.S. 571, 579 (1934). However, whether Congress' enacted legislation constitutes a taking depends on which of those entities is the obligor in the contract. The Supreme Court has said that "Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between *private* parties." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 528 (1998) (plurality) (emphasis added).

It is a contract between private parties that is now before the Court. The case at bar arose as a breach of an employment agreement between three private parties: HRB, the Bank, and Harvard. Likewise, Harvard asserts that the government has taken the contractual right to severance compensation prescribed in his employment agreement with HRB and the Bank.

In support of his argument, Harvard cites several cases in which the United States Supreme Court has protected property rights. However, the Court does not find these cases instructive because each of them deal with *public* contracts between a private party and the federal government, many of which were resolved under a breach of contract claim rather than a Fifth Amendment takings claim. *See, e.g., Lynch*, 292 U.S. 571; *Perry v. United States*, 294 U.S. 330 (1935); *United States v. Winstar Corp.*, 518 U.S. 839 (1996). In *Perry*, Congressional legislation negatively impacted the terms on which a bond would be paid by the federal government, resulting in a loss to the bondholder. At the very outset of its opinion, the Supreme Court noted that the bond at issue in that case "differs from an obligation of private parties . . . whose contracts are necessarily made in subjection to the dominant power of the Congress." 294 U.S. at 348.

Harvard does cite cases involving the taking of *private* contract rights though. *See, Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935). In *Pennsylvania Coal Co. v. Mahon*, the Supreme Court said that "when [regulation] reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to support the act." 260 U.S. at 413. However, the Court said that regulatory taking "is a question of degree[ ] and therefore cannot be disposed of by general propositions." *Id*. at 416. The Supreme Court, at that time, gave no other guiding principles to determine if a taking has occurred.

Shortly following *Mahon*, however, the Supreme Court, in *Omnia Commercial Co. v. United States*, addressed private contracts affected by government action. 264 U.S. 502 (1923). The Supreme Court noted that, "[i]f, under any power, a contract or other property is taken for public use, the

Government is liable; but, if injured or destroyed by lawful action, without a taking, the Government is not liable." *Id.* at 510. In *Omnia*, the plaintiff had a contract to buy steel plates from a manufacturer at a below-market price. *Id.* at 507-08. During World War I, the government requisitioned the manufacturer's entire production of steel and directed the manufacturer not to sell to the plaintiff. *Id.* The plaintiff alleged that the government took for public use its right of priority to the steel. *Id.* at 508. The Supreme Court saw it differently and stated that the "[the Fifth Amendment] has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. *Id.* at 510. The Supreme Court held that the government took the steel from the steel company, but did not succeed to the rights and duties under the contract. *Id.* Therefore, the Supreme Court held that the government did not take the contract. *Id.* at 510-11.

In *Cienega Gardens v. United States*, the Federal Circuit sought to provide clarification as to the reach of *Omnia* when it stated that "*Omnia* refers to legislation targeted at some public benefit, which incidentally affects contract rights, not . . . legislation aimed at the contract rights themselves in order to nullify them." 331 F.3d 1319, 1335 (Fed. Cir. 2003). In *Cienega Gardens*, the plaintiffs owned real estate and "received loans from private lenders to construct housing projects that for a period of years would be under the housing programs established by sections 221(d)(3) and 236 of the National Housing Act." *Id.* at 1325. Each owner entered into a Regulatory Agreement with the Department of Housing and Urban Development ("HUD") that "placed a variety of restrictions on the owners, including restrictions on the income levels of tenants," but gave the owners the right to prepay their forty-year mortgages after twenty years without HUD approval. *Id.*

When it became clear that large numbers of the owners intended to prepay their forty-year mortgages resulting in a substantial loss of low income housing, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), 12 U.S.C. § 1715, and the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), 12 U.S.C. §§ 4101, *et seq. Id.* at 1326-27. Under ELIHPA and LIHPRHA, the owners needed HUD approval to prepay their forty-year mortgage after twenty years "despite their mortgage contracts containing a provision guaranteeing prepayment 'without [HUD] approval'." *Id.* at 1326.

The Federal Circuit found that "the owners' property interests vested . . . immediately upon execution of the mortgage loan agreement and the purchase of the land." *Id.* at 1328. The court held that "[t]hese property interests were expressly and deliberately abrogated by ELIHPA and LIHPRHA" and "Congress' enactment of ELIHPA and LIHPRHA did go 'too far'." *Id.* at 1353, 1337.

While *Cienega Gardens* involves *public* agreements between the homeowners and HUD, the guarantee of prepayment granted by the government was found specifically in the mortgage agreements between the homeowners and the private lenders, a *private* contract. Of course, the issue in the action at bar is whether enactment of the June Rule targeted Harvard's severance compensation and was not simply incidental to lawful government action. As in *Cienega Gardens*, "[w]hether a given regulation goes 'too far' for purposes of the *Fifth Amendment* is determined by an ad hoc, factual inquiry." *Id.* at 1337. "Under *Penn Central*, courts use a three-factor analysis to assess claimed regulatory takings: (1) character of the governmental action, (2) economic impact of the legislation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations." *Id.* In the case at bar, whether the legislation is aimed at nullifying contract rights depends on the character of the government action. *Id.* The Court finds that the amendment to the EESA and the June Rule are targeted at Harvard's contract rights because its enactment expressly and deliberately abrogates those rights.

First, the June Rule affects a total loss of Harvard's contract rights. Under the employment agreement, following a change in control, Harvard was entitled to sixty monthly payments beginning the last day of the month in which he resigned. The June Rule extinguishes that right. Treasury regulation even prohibits such payments *following* HRB's participation in the TARP program. The regulation states that "[a] golden parachute payment is treated as paid at the time of departure . . . [t]hus, a golden parachute payment during the TARP period may include a right to amounts actually payable after the TARP period." 31 C.F.R. § 30.9. Because Harvard's time of departure was during the TARP period, the June Rule prohibits HRB from paying any of his change in control payments, even after the TARP period expires.

The Court also agrees that TARP and its subsequent regulations were legislation targeted at some public benefit. *See,* Emergency Economic Stabilization Act, 12 U.S.C. § 5201(1) ("to immediately provide authority and facilities that the Secretary of Treasury can use to restore liquidity and stability to the financial system of the United States"); *See, also, e.g., Omnia Commercial Co. v. United States*, 261 U.S. 502 ("the United States may, consistently with the *Fifth Amendment*, impose for a permitted purpose, restrictions upon property which [results in serious depreciation of property values]."); *Cienega Gardens*, 331 F.3d 1319 ("*Omnia* refers to legislation targeted at some public benefit, which incidentally affects contract rights . . . ."). What matters here is the relationship that developed between Treasury, HRB, and Harvard as a result of that legislation.

Treasury, although operating under a regulatory scheme, began its relationship with HRB as an investor. HRB's letter agreement accompanying the Securities Purchase Agreement states: "The purpose of this letter

agreement is to confirm the terms and conditions of the purchase by the *Investor* [Treasury] of the Purchased Securities." (Emphasis added.) The letter agreement further states:

> The company set forth on the signature page hereto [HRB] intends to issue in a private placement the number of shares of a series of its preferred stock set forth on Schedule A. . . and a warrant to purchase the number of shares of its common stock set forth on Schedule A. . . and the United States Department of the Treasury (the "*Investor*") intends to purchase from [HRB] the Purchased Securities.

In other words, Treasury, while providing financial assistance, is an investor, contracting to purchase securities from HRB. The EESA contemplates and permits this relationship:

> The Secretary is authorized to establish the Troubled Asset Relief Program (or "TARP") to purchase, and *to make and fund commitments to purchase*, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with this chapter and the policies and procedures developed and published by the Secretary.

12 U.S.C § 5211(a)(1) (emphasis added).

In order to close on the Securities Purchase Agreement, HRB had to be in compliance with certain regulations contemplated in the Agreement. The Agreement states:

> [HRB] shall have effected such changes to its compensation, bonus, incentive, and other benefit plans, arrangements, and agreements (including golden parachute, severance, and employment agreements). . . with respect to its Senior Executive Officers. . ., as may be necessary, during the period that the Investor owns any debt or equity securities of the Company acquired pursuant to this Agreement or the Warrant, in order to comply with Section 111(b) of the Emergency Economic Stabilization Act of 2008. . . as implemented by guidance or regulation thereunder that has been issued and is in effect as of the Closing Date . . . .

Further, in the "Executive Compensation" section of the Securities Purchase Agreement, the above changes are reiterated with HRB's agreeing that all "Benefit Plans with respect to its Senior Executive Officers comply in all

respects with Section 111(b) of the EESA as implemented by any guidance or regulation thereunder that has been issued and *is in effect as of the Closing Date* ...." (Emphasis added.) In both clauses, compliance with regulation is limited to those regulations "in effect as of the Closing Date." The closing date on the securities purchase was December 31, 2008. As of that date, the October Rule, which limited severance compensation to three times the base salary over a five year period, was the rule in effect. What is not found in the provisions are the words "or as amended." The Securities Purchase Agreement does provide "the Investor may unilaterally amend any provision of this agreement to the extent required to comply with any changes after the signing date in applicable federal statutes." However, as this letter opinion addresses, it is the applicable federal statute that is an unconstitutional taking. Therefore, read narrowly, the right to amend only applies to Treasury's ability to amend the agreement to comply with federal law. Reservation of Treasury's right to amend does not represent a general acceptance by HRB that the government can alter the terms of the agreement in any manner beneficial to itself, thereby negating the finding that Harvard's severance compensation is property subject to the guarantees of the Fifth Amendment.

While Harvard was not a party to the signing of the Securities Purchase Agreement in his personal capacity, the Agreement imposed requirements on him as well. In order to close the Agreement, not only did HRB have to comply with the October Rule, but "to the extent necessary for such changes to be legally enforceable, each of its Senior Executive Officers shall have duly consented in writing to such changes." Additionally, the Securities Purchase Agreement required that:

> [E]ach of [HRB's] Senior Executive Officers shall have delivered to the Investor a written waiver in the form attached . . . releasing the Investor from any claims that such Senior Executive Officers may otherwise have as a result of the issuance, *on or prior to the Closing Date*, of any regulations which require the modification of, and the agreement of [HRB] hereunder to modify, the terms of any Benefit Plans with respect to its Senior Executive Officers to eliminate any provisions of such Benefit Plans that would not be in compliance with the requirements of Section 111(b) of the EESA as implemented by guidance or regulation thereunder *that has been issued and is in effect as of the Closing Date.*

(Emphasis added.) These requirements resulted in Harvard's letter agreement with HRB and subsequent waiver, both dated December 31, 2008. Again, the language in the above provisions limits compliance to all regulations in effect as of the closing date. Harvard's waiver specifically

states "I hereby voluntarily waive any claim . . . for any changes required to comply with the regulation issued by the Department of Treasury as published in the Federal Register on October 20, 2008." Treasury accepted the letter agreement and waiver as legally enforceable and closed on the securities purchase.

HRB and Harvard took affirmative steps to acknowledge that they were subject to Treasury regulations issued prior to or on the closing date. *None of those agreements acknowledge that they would be subject to future regulations.* Given these written agreements, certainly HRB and Harvard have certain expectations of the government, not to be disturbed by further legislation. These expectations are visible in HRB's 2009 proxy statement which, following enactment of the June Rule, states:

> [The amendment to the EESA] requires the Secretary of the Treasury to establish compensation standards, some of which appear to require limitations that exceed the limitations agreed to by our five senior executive officers and that appear to be inconsistent with our contractual obligations to these officers and other highly compensated employees.

Treasury's requirements resulted in Harvard's vested contract right through the letter agreement. Instead of amending existing agreements or requiring the execution of new agreements, the June Rule simply exceeds the agreements already made.

Finally, the Court, nevertheless, agrees that those who accept funds from the government are subject to the regulating powers of the federal government. Likewise, "contracts must be understood as having been made in reference to the possible exercise of the rightful authority of the Government, and that no obligation of a contract can extend to the defeat of that authority." *Norman v. Baltimore & O. RR.*, 294 U.S. 240, 305 (1935). However, given the nature of the Securities Purchase Agreement, Treasury providing liquidity in the form of an investor, and the written agreements therein, amendment to the EESA and the subsequent June Rule is not simple regulation of banking. Rather, Treasury has entered the relationship as an investor and contracted the terms of the agreed limitations. The amendment, seeking to improve those terms, specifically targets contracts such as Harvard's in order to protect the investment made by the federal government.

The survey of the Securities Purchase Agreement, letter agreements, and waiver demonstrates what is at stake. A large sum of public funds has been used to provide financial assistance and make investments. Certainly, the federal government wants to prevent the misuse of those funds, and one such concern is that public funds used to provide financial assistance would be used to provide severance compensation to SEOs. However, because this

was a primary concern of the amendment, it specifically targeted contracts such as Harvard's. Senator Dodd stated:

> This amendment would apply to recipients of TARP assistance, stronger restrictions on executive compensation . . . . The amendment bans bonuses for most highly paid executives of TARP-recipient firms: Prohibits TARP recipients from paying a bonus, retention award, or other similar incentive compensation to the 25 most highly-paid employees or such higher number as the Secretary of the Treasury may determine is in the public interest with respect to any TARP recipient . . . . *This will encourage the companies to use the TARP funds for the purposes they were intended and assure the American taxpayers that their funds are being used properly.*

155 Cong. Rec. 1,474 (2009) (emphasis added).

The targeted nature of the amendment and the June Rule is further supported by the manner in which Treasury applied the rule. For instance, the June Rule was applied retroactively, altering the already contracted compensation packages of the executives of banks receiving TARP funds. The amendment to the EESA and subsequent June Rule are not simply acts of government regulation to which Harvard's contract is incidental, because Treasury acted as an investor, securing its own interest.

The Court agrees that it is well within the federal government's power to place stipulations upon the receipt of public funds in order to address concerns regarding the use of such funds. Nonetheless, while HRB and Harvard voluntarily accepted the funds and accompanying regulations, they did so under the understandings and agreements laid out in the Securities Purchase Agreement. Harvard has not subsequently altered or waived his current claim to compensation, contemplated under the October Rule, as he originally did in contemplation of the Securities Purchase Agreement. Harvard has a contract right to his severance compensation. That right is bolstered, in no uncertain terms, by the requirements and expectations placed upon HRB and Harvard by Treasury and the Securities Purchase Agreement. As in *Cienega Gardens*, the legislation is targeted at Harvard's contract rights in order to protect the investment made by the government. The legislation goes too far. Therefore, retroactive application of the amendment and the subsequent June Rule to Harvard's severance compensation constitutes a Fifth Amendment taking for which just compensation has not been provided.

In light of the Court's ruling on the Defendant's Plea in Bar, the parties agreed at the hearing on April 21, 2014, to conduct a hearing on May 5, 2014, on the issue of damages.

The amendment to the EESA and the subsequent June Rule are directly targeted at contract rights such as Harvard's. Therefore, the amendment constitutes a taking for which just compensation has not been provided. As such, the Court denies the Defendants' Plea in Bar.