# Staunton

## Housing Authority of the City of Bristol v. East Tennessee Light & Power Company.

September 6, 1944.

Record No. 2845.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Donald T. Stant* and *Floyd H. Roberts*, for the plaintiff in error.

*H. G. Lavinder* and *Jones & Woodward*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Housing Authority of the city of Bristol, Virginia, hereinafter referred to as plaintiff or Authority, instituted this proceeding by notice of motion for judgment against East Tennessee Light & Power Company, sometimes referred to

as defendant or Utility, for damages in the sum of $18,-878.07, with interest, subject to a credit of $5,500, for breach of two contracts. The terms and provisions of the contracts, so far as we are concerned, are identical. They will be hereinafter referred to as constituting one contract.

The breach alleged is that, during the winter of 1941-42, Utility failed to furnish, in accordance with its contract, natural gas for heating the tenanted buildings of Authority, with the result that Authority was forced to replace the gas heating units in its buildings with coal heating boilers. The amount of damages claimed is the cost of the change-over of such heating units.

Authority contended that the agreement to furnish its gas requirements was a clear, complete, and unambiguous contract of hazard, and that to excuse its performance would enable Utility to profit by its own wrong.

Utility based its defense upon the grounds, first, that the express provisions of the contract excused its performance, in that impossibility of performance was occasioned by an act beyond its control; and, second, that performance had become impossible because the subject matter essential to performance, which both parties used as the basis of the contract, had ceased to exist. The trial court restricted its defense to the second ground. Upon the evidence, and under the instructions of the court, the jury returned a verdict for the defendant which the court refused to set aside.

Authority assigns error to the action of the court in refusing to strike all of the grounds of defense, and in giving and refusing certain instructions, especially to the giving of instruction "E," hereinafter set out in full. The defendant assigns cross-error because it was not permitted to rely upon its first ground of defense.

The case presents questions both of fact and of law. In view of the favorable verdict for the defendant, the facts may be summarized as follows:

Authority is an agency organized, under state and federal statutes, for the purpose of constructing and renting low-rent dwellings in the city of Bristol, Virginia. Utility is a

public service corporation engaged in the business of supplying electricity and gas to customers in the Bristol area.

In 1940, Authority made plans for the construction of twenty-five large dwellings in two projects, one for white persons and one for negroes. For many months prior thereto, together with the advice and assistance of National Housing Authority, its superior, it considered the character of heating to be used in its buildings. After extended investigations and negotiations, it decided to use natural gas for refrigeration, cooking, and space heating. The specifications for the construction of its buildings were prepared to that effect. Thereafter, on September 5, 1940, it entered into a contract with Utility, whereby Utility agreed to supply Authority and its tenants all of their gas requirements for refrigeration, cooking, and heating. The gas to be supplied was described as "natural gas," and the charge therefor was twenty-five cents per M cubic feet, delivered by the facilities of Utility through two meters, one in each project. The contract was to continue in effect for five years, with the right of renewal under conditions therein prescribed.

Section 19 of the contract read as follows:

"19. *Impossibility of Performance:* The Utility shall use all reasonable diligence in providing a constant and uninterrupted supply of electric energy and gas, but the Utility shall not be liable to the Authority hereunder, nor shall the Authority be liable to the Utility hereunder by reason of failure of the Utility to deliver or the Authority to receive electricity or gas as the result of fire, strike, riot, explosion, flood, accident, breakdown, acts of God, or the public enemy, or other acts beyond the control of the party affected; it being the intention of each party to relieve the other of the obligation to supply electricity or gas or to receive and pay for electricity or gas when as a result of any of the above mentioned causes, either party may be unable to deliver or use in whole or in part the electricity or gas herein contracted to be delivered and received. Both parties shall be prompt and diligent in removing and overcoming the cause or causes of said interruption, but nothing herein

contained shall be construed as permitting the Utility to refuse to deliver or the Authority to refuse to receive electricity or gas after the cause of interruption has been removed. In case of impaired or defective service, the Authority shall immediately give notice to the nearest office of the Utility by telephone or otherwise, confirming such notice in writing as soon thereafter as practicable."

Preceding the execution of the contract, natural gas had been discovered in an area adjacent to the city of Bristol, by a corporation known as the Bristol Natural Gas Corporation. Bristol undertook to develop this field and drilled several wells, with a measure of success. The gas therefrom was piped to the city of Bristol, Virginia, in lines owned by the Industrial Gas Corporation, a public service corporation, which had, in 1937, been granted a limited franchise from the above city permitting it to supply natural gas to industrial users, public buildings, schools, and colleges.

East Tennessee Light & Power Company, in 1937, manufactured artificial gas and owned a distributing system for such gas in the cities of Bristol, Virginia, and Bristol, Tennessee. Industrial Gas Corporation suggested that Utility discontinue its distribution of artificial gas and take over the distribution of natural gas in its stead. Utility, not being entirely satisfied with the assurance of Industrial that there was ample natural gas to take care of all of its requirements, had its officers and engineers examine into and discuss the situation with qualified geologists, who had examined and tested the gas fields. It caused to be checked all industrial plants and possible domestic customers, and made up estimates as to the amount required by them for cooking, water heating and space heating. These estimates were made up for separate years up to a ten-year period, and showed that Utility could reasonably be expected to sell over the ten-year period approximately two billion cubic feet of gas. It was assured by experienced geologists and engineers that there was ample natural gas to supply all of its needs in its territory. The lowest estimate of the natural reserve was in excess of two billion cubic feet, a supply sufficient to last for at least ten

years, while other estimates ran as high as a minimum reserve of three and one-half billion cubic feet.

During the period of these investigations and negotiations, an additional well was drilled, which appeared to be nearly as good as two of the best already drilled. As a result, an agreement was entered into on February 8, 1939, between Industrial Gas Corporation and Utility, whereby the former agreed to sell and deliver to Utility all of the natural gas which might be necessary to enable Utility to supply the total gas requirements of all of its customers then or thereafter to be served in the cities of Bristol, Virginia, and Bristol, Tennessee, and their environs, reserving to Industrial sufficient gas, obtained under its agreement with Bristol Natural Gas Corporation, to supply such customers as Industrial then had or might thereafter secure, pursuant to its franchise in the above cities.

J. F. McCrary, the executive director and housing manager of Authority, sometime in the early part of 1939, conferred with officers of the Industrial Gas Corporation about securing gas for heating the project buildings. He said he was assured by that corporation that they had ample gas. Later in the year, representatives of the United States Housing Authority and the Bristol Authority discussed the matter with the president of Industrial. United States Housing Authority agreed to the installation of gas heating boilers. Thereafter Industrial informed McCrary that East Tennessee Light & Power Company, the distributor of natural gas under the contract of February 8, 1939, above mentioned, would probably like to make the contract with Authority. McCrary then discussed the matter with the president and other officers of Utility, in person and by written correspondence. Representatives of the United States Housing Authority of Washington, D. C., entered into this discussion, and eventually the contract in question, prepared from a standard form used by United States Housing Authority, with certain modifications and changes, was signed by the parties. The officers of Authority knew of the existence of the gas fields. They were satisfied by their investigations

and negotiations, for McCrary testified that, at the time the contract was signed, he and the other officers of Authority felt there was ample gas for all of their requirements.

Natural gas was first turned into the mains of Utility in June, 1939, approximately a little more than a year before the contracts of September 5, 1940. Authority estimated that it would require approximately two million cubic feet per month. This additional load on the system was much less than the amount which Utility had estimated to be used.

In September, 1940, the open flow from the wells was approximately four million feet a day, which meant that about one and one-third million feet a day was deliverable in Bristol to Utility. In 1939 and 1940, Utility was selling only a small portion of the gas which was available to it. At no time did it have a load of more than 50% of the million cubic feet per day which came from the wells. The pressure of the wells in the fall of 1939 was around 1200 pounds; in September, 1940, 800 pounds; and in March, 1941, it dropped to 230 pounds. It remained fairly constant at the latter figure during the next few months. In October, 1941, it reached 395 pounds; but in January, 1942, it abruptly fell to 150 pounds. The result was that the amount of gas available to Utility's customers had been reduced to less than one-fourth of the amount which it had been estimated it would receive, and it was impossible during the cold weather to supply the requirements of all of its customers for cooking; refrigeration, and heating. The engineers said it looked like the gas was gone. No one was able to give a specific reason therefor.

Faced with this situation, Utility realized that the burden on its system must be reduced in the interest of all of its customers. Artificial gas was not procurable. Utility had dismantled its artificial gas plant. If they had reconstructed it and manufactured artificial gas to the entire capacity of their plant, it would not have been sufficient, together with the natural gas, to fill the requirements of all of its customers. Besides, artificial gas is a different kind of gas from natural gas. It has different characteristics, and different

means have to be provided for its distribution. The contract, however, was for natural gas. The amount of natural gas served customers taken on by Utility after September, 1940, would not have relieved the situation if it had been reserved for Authority's requirements. The real reason Utility could not deliver the natural gas was that the quantity required had ceased to exist.

Since it was clearly apparent that in cold weather space heaters would drain the system empty, Utility declined to take on additional users at the first indication of a shortage. Two additional gas wells were then being drilled. When their production was so small that the difficulty was not removed, Utility, by personal interviews, advertisements, letters and the radio, undertook to persuade its customers using space heating to voluntarily change to another type of fuel heating for the common good. A large number of them did so, including Authority. Authority was advised of the shortage in November, 1941, and beginning in January, 1942, it changed the installation in its twenty-five buildings from gas-fired boilers to coal-fired boilers, completing the change on April 6, 1942. This change was made after the execution of a supplemental agreement between the parties, dated January 23, 1942, whereby Authority agreed to discontinue the use of natural gas for heating its buildings as soon as it could change over to another form of heating, but without waiving any of its rights under the contract of September, 1940. Utility did not cut off the gas supply to Authority or to any other customer, nor was any reduction made in the cooking and refrigeration requirements of any customer.

This controversy relates only to natural gas required for space heating. Evidence of the failure of a sufficient supply therefor clearly appears from the record.

The defense of impossibility of performance has become in modern times an established principle of law in many jurisdictions. Its origin and development have been ex-

haustively discussed in textbooks, law reviews and encyclopedias, as well as in many reported cases.*

The conclusions reached in the decided cases are not harmonious, due, perhaps in part, to the multitude of circumstances or conditions under which the question was presented. It is impossible to state a general rule which will be applicable to all classes of cases.

 It is, however, fairly well settled that where impossibility is due to domestic law, to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance, or to the fortuitous destruction, or change in the character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance, the promisor will be excused, unless he either expressly agreed in the contract to assume the risk of performance, whether possible or not, or the impossibility was due to his fault.

 The tendency of the law is towards an enlargement of the defense, provided the application of the principle does not conflict with other established rules governing the construction of contracts. As a result a fourth classification has been frequently allowed in recent years, that is, impossibility due to the failure or non-existence of a certain state of affairs or means of performance, the continued existence of which was contemplated by both parties as the basis of their contract, but not contracted for. Williston on Contracts, Revised Edition, Vol. 6, section 1935, *et seq.*; Williston on Sales, section 661.

In Williston on Contracts, *supra*, section 1948, it is said:

"Not only where a specific thing is itself to be sold or transfered, but wherever a contract required for its performance the existence of a specific thing, the fortuitous destruction of that thing, or such impairment of it as makes

---

*Williston on Contracts, (Rev. Ed.) Vol. 6, section 1931, *et seq.*; 18 Michigan Law Review, page 589; 1 Columbia Law Review, page 529; 2 Columbia Law Review, page 421; and Annotation: "Destruction or loss of specific property which is the subject or basis of a contract, after the inception of the contract, as excuse for nonperformance," 12 A. L. R., page 1273, and 74 A. L. R., page 1289.

it unavailable, excuses the promisor, unless he has clearly assumed the risk of its continued existence."

In 12 Am. Jur., Contracts, section 372, this is said:

"372. Destruction of Specific Thing.—In the absence of a contrary provision, if the act to be performed is necessarily dependent on the continued existence of a specific thing, the perishing thereof before the time for performance, without the fault of the promisor, will excuse non-performance of the contract. This is especially true where, from the nature of the contract, it appears that the parties must, from the beginning, have known that it could not be fulfilled unless when the time for the fulfillment of the contract arrived, some particular specified thing continued to exist. The contract is not, in the absence of any express or implied warranty that the thing shall exist, to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor." (Cases cited.)

In Restatement of the Law of Contracts, section 460, the subject is covered as follows:

"Non-existence or Injury of Specific Thing or Person Necessary for Performance.

"(1) Where the existence of a specific thing or person is, either by the terms of a bargain or in the contemplation of both parties, necessary for the performance of a promise in the bargain, a duty to perform the promise

"(a) never arises if at the time the bargain is made the existence of the thing or person within the time for seasonable performance is impossible, and

"(b) is discharged if the thing or person subsequently is not in existence in time for seasonable performance

"unless a contrary intention is manifested, or the contributing fault of the promisor causes the non-existence."

17 C. J. S., Contracts, section 464, is to like effect:

"Where from the nature of the contract it is evident that the parties contracted on the basis of the continued existence of the person or thing, condition or state of things, to which it relates, the subsequent perishing of the person or thing,

or cessation of existence of the condition, will excuse the performance, a condition to such effect being implied, in spite of the fact that the promise may have been unqualified." (Cases cited.)

In *Virginia Iron, etc., Co.* v. *Graham*, 124 Va. 692, 98 S. E. 659, the mining company, a lessee of ore lands upon a royalty basis, brought a suit in equity to cancel the lease, because it was found, after a period of mining, that the low grade of the remaining ore did not justify the continuance of mining operations. It appeared from the record that the basis of the contract, the existence of iron ore in quantities great enough to justify the continuance of mining operations, was assumed as a fact by both parties. Under these circumstances, we said:

"If one makes a contract to do a thing which is in itself possible, he will be liable for a breach of the contract, notwithstanding it is beyond his power to perform it. But where, from the nature of the contract itself it is apparent that the parties contracted on the basis of the continued existence of the substance to which the contract related, a condition is implied that if performance becomes impossible because that substance does not exist, this will and should excuse such performance." (Citing many cases.)

The above case is the nearest approach we have made to the particular subject under discussion, and in its decision we committed ourselves to the above principles as supported by right, reason, and justice. In *Lehigh Portland Cement Co.* v. *Virginia Steamship Co.*, 132 Va. 257, 111 S. E. 104, that case was cited and our conclusion approved.

With these governing principles in mind, we come now to their application to the facts and circumstances of this case.

The contract related to natural gas. While it did not specify the particular source of supply as a necessary means of its performance, the evidence, as the trial judge stated in his able written opinion, "shows beyond a doubt that both parties did, in fact, contemplate the continued existence of a nearby gas deposit as a means of performance, that deposit being the only one known to this section of the country."

█ Each party to the contract knew that the supply of gas had to come from that specific locality. No other source of supply was available. Each knew that the supply from that field furnished the essential and necessary means of performance, and that the contract could not be fulfilled unless the gas supply continued to exist. They contemplated and assumed its continued existence and contracted with reference thereto as the means of performance. Their contemplation is not in conflict with the language of the contract. The evidence of that fact, as the learned trial judge said, "simply applies the language used to the transaction."

In addition to a number of instructions requested by each of the parties, the trial court, of its own motion, gave instruction "E," as follows:

"The Court instructs the jury that if you find from a preponderance of the evidence that defendant has breached the contract sued upon, in arriving at a verdict you shall, first, ascertain whether a failure of the supply in the gas deposit from that existing at the time of the contract, not caused by defendant, otherwise than by normal withdrawal in due course of business, has rendered performance of the contract impossible. *If you find that no such change has occurred, or that if such change occurred, it did not render performance impossible, then your verdict shall be for the plaintiff.*

"If you find that such change has occurred, and that such change rendered performance by defendant impossible, then you shall ascertain, second, whether both parties to the contract did in fact contract, though not set forth in the terms of the contract, with reference to the continued existence of an adequate supply of gas from the fields of Bristol Natural Gas Corporation as the contemplated means of fulfilling the contract by defendant. *If you find that they did not both contract with reference to such supply, then your verdict shall be for the plaintiff.*

"If you find that they did both contract with reference to such source of supply, then you shall determine, third, under the whole evidence, including the contract (as construed by the Court), and all the circumstances and condi-

tions at the time of the contract, and the relative knowledge by the parties of such circumstances and conditions, whether defendant may be reasonably assumed to have taken the risk of liability in the event of such impossibility by failing to provide against it in the contract. *If you find that defendant may reasonably be assumed to have taken the risk by failing to provide against the event in the contract, then you shall find for the plaintiff. If you find that defendant may not reasonably be assumed to have taken the risk by failing to so provide, then you shall find for the defendant.*

*"The burden is upon the defendant of proving the fore-going three conditions relieving it from liability by a pre-ponderance of the evidence."* (Italics supplied.)

This instruction was most favorable to the plaintiff. Under it the jury was told that they should find a verdict for the plaintiff if they believed that the evidence disclosed any one of three circumstances, (1) that there was no fail-ure of the supply of natural gas; (2) that the parties did not contract with reference to a continued existence of an ade-quate supply of gas; or (3) that the defendant could reason-ably be assumed to have taken the risk by failing to provide against the event which occurred.

A verdict could, under the fourth paragraph of the in-struction, have been reached for the defendant only if the jury believed that a preponderance of the evidence showed the negative or reverse of all three of the above hypotheses or conditions. The jury found for the defendant upon each hypothesis, and their findings supported by the evidence are binding upon us as to the facts.

We find no merit in the assignments of error relating to the refusal of the court to give certain instructions requested by the plaintiff. The refused instructions either directed a verdict for the plaintiff, were in conflict with instruction "E," or deprived the defendant of any defense based on im-possibility of performance.

In view of the verdict of the jury, the judgment of the trial court, and our conclusions above expressed, it is un-necessary to discuss the contentions of the defendant rela-tive to the ruling of the court in striking out its ground of

defense under paragraph 19 of the contract, or whether it duly assigned cross-error thereto. Under the circumstances, the alleged cross-error, if any, was harmless to the defendant.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*