PRESENT:  All the Justices

HAMPTON ROADS BANKSHARES, INC., ET AL.

OPINION BY
JUSTICE WILLIAM C. MIMS
v.  Record No. 150323
January 14, 2016

SCOTT C. HARVARD

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Charles E. Poston, Judge

In this appeal, we consider whether a financial institution participating in the federal

Troubled Assets Relief Program ("TARP") can assert the federal prohibition on "golden

parachute payments" as a defense to a breach of contract action brought by one of its former

senior executive officers, and whether said officer may collaterally attack the prohibition as an

unconstitutional taking without just compensation.  We also consider whether a fee shifting

provision in an employment agreement falls within the scope of a prohibited "golden parachute

payment."

I.  BACKGROUND AND MATERIAL PROCEEDINGS BELOW

A.      Background

Scott C. Harvard ("Harvard") was the president and chief executive officer of Shore

Bank, as well as the chief executive officer of its parent holding company, Shore Financial

Corporation.  On January 8, 2008, Harvard and Shore Bank entered into a new employment

agreement (the "Employment Agreement") occasioned by a merger between Shore Financial

Corporation and Hampton Roads Bankshares.  Hampton Roads Bankshares was the surviving

entity.

Pursuant to the Employment Agreement, Harvard became an executive vice president of

Hampton Roads Bankshares, while continuing to serve as Shore Bank's president and chief

executive officer.[1]  The Employment Agreement provided a generous compensation package, including, among other benefits, an annual base salary of not less than $250,000, a $244,000 retention bonus, $400,000 in deferred compensation, a car allowance, country club membership dues, and a $175,000 non-compete payment.

The Employment Agreement contained additional provisions governing compensation in the event of termination.  In relevant part, Section 3(b)(iii) permitted Harvard "to terminate his employment . . . within six (6) months after the occurrence of a 'Change in Control' with respect to HRB, its successors or assigns, . . . in which case Employer shall be obligated to pay the Officer and furnish him the benefits provided in Section 4 hereof."  Section 4 provided for a "severance allowance," defined as "2.99 times (2.99x) the base amount" and payable in sixty equal monthly installments.  The "base amount" was equal to Harvard's "average annualized includible compensation" for "the most recent three (3) taxable years ending before the date on which the Change of Control occurs."[2]

At the same time that the parties entered into the Employment Agreement, America was descending into the Great Recession, precipitated by a financial downturn that began in August 2007.  See Marc Labonte, Cong. Research Serv., R40198, The 2007-2009 Recession: Similarities to and Differences from the Past 7 (2010).  On October 3, 2008, in response to the developing financial crisis, Congress enacted the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 ("EESA").  Congress designed EESA "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States."  EESA § 2, 12 U.S.C. § 5201.  To that end, the act

---

[1] Hereinafter, this opinion will refer to Shore Bank and Hampton Roads Bankshares collectively as "HRB."

[2] Such payments are commonly known as "golden parachutes."  See Black's Law Dictionary 807 (10th ed. 2014).

created TARP and authorized the Secretary to purchase "troubled assets" from financial institutions to promote market stability. EESA §§ 3, 101, 12 U.S.C. §§ 5202, 5211.

EESA imposed conditions on financial institutions that elected to participate in TARP, requiring adherence to certain standards for executive compensation and corporate governance. As relevant to this case, it prohibited participating financial institutions from "making any golden parachute payment to its senior executive officer during the period that the Secretary holds an equity or debt position in the financial institution." EESA § 111(b)(2)(C) (then codified at 12 U.S.C. § 5221(b)(2)(C)). At the time, the term "golden parachute payment" was not defined in EESA.

In subsequent regulations implementing EESA and TARP, Treasury defined a "golden parachute payment" as

> any payment in the nature of compensation to (or for the benefit of) a [senior executive officer] made on account of an applicable severance from employment to the extent the aggregate present value of such payments equals or exceeds an amount equal to three times the [senior executive officer's] base amount.

TARP Capital Purchase Program, 73 Fed. Reg. 62205, 62209 (Oct. 20, 2008) (then codified at 31 C.F.R. § 30.9(a)) ("October Rule").

During the 2008 financial crisis, HRB was threatened by "[d]ramatic declines in the housing market," related "turmoil and tightening of credit" throughout the financial market, and a corresponding "lack of confidence in the financial market." Hampton Roads Bankshares, Form 10-K, Annual Report for the Fiscal Year Ended December 31, 2008, at 16. Consequently, HRB applied to participate in TARP.

On December 31, 2008, HRB and the federal Department of the Treasury ("Treasury") entered into an agreement for TARP funding (the "TARP Agreement") whereby Treasury

3

recapitalized HRB with an infusion of $80.3 million that HRB agreed to use "to expand the flow of credit to U.S. consumers and businesses . . . to promote the sustained growth and vitality of the U.S. economy."[3] This cash infusion helped HRB weather significant losses throughout 2009. See Hampton Roads Bankshares, Form 10-Q, Quarterly Report for the Quarterly Period Ended September 30, 2009, at 4. The TARP Agreement required HRB to comply with the limits on executive compensation set forth in EESA and its implementing regulations. Significantly, in the TARP Agreement HRB also agreed that Treasury could "unilaterally amend any provision of this Agreement to the extent required to comply with any changes after the Signing Date in applicable federal statutes."

On the same day that HRB and Treasury entered into the TARP Agreement, Harvard agreed to amend the Employment Agreement to comply with EESA and its implementing regulations. Specifically, Harvard acknowledged that, in consideration of the $80.3 million cash infusion obtained pursuant to the TARP Agreement, HRB was required to amend its existing compensation agreements to comply with EESA. He also acknowledged that he would receive personal benefits from HRB's participation in TARP. Accordingly, Harvard agreed to a marginal modification of his golden parachute payment to comply with the October Rule. Harvard also agreed that the golden parachute payment provision in the amended Employment Agreement would be construed and administered to comply with EESA § 111, 12 U.S.C. § 5221.

Also on that day, HRB acquired Gateway Bank, which resulted in a "Change of Control" under the Employment Agreement. Thus, the acquisition triggered Harvard's right to terminate his employment within six months from the change in control and receive the golden parachute payment.

---

[3] In consideration for its capital investment, Treasury received HRB securities that were to be returned when HRB repaid the TARP funds.

4

On February 17, 2009, Congress amended EESA by enacting the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 ("ARRA"). It overrode Treasury's definition of a "golden parachute payment" in the October Rule, defining the term as

> any payment to a senior executive officer for departure from a company for any reason, except for payments for services performed or benefits accrued.

ARRA § 7001, 12 U.S.C. § 5221(a)(2).[4] On June 15, 2009, Treasury issued an interim final rule implementing the ARRA amendments to EESA. TARP Standards for Compensation and Corporate Governance, 74 Fed. Reg. 28394 (June 15, 2009) (codified at 31 C.F.R. pt. 30) ("June Rule"). The preamble to the June Rule explained that "[g]iven the language of the ARRA, there is no longer any exception for any amount of a golden parachute payment . . . . In addition, a golden parachute payment is treated as paid at the time of the employee's departure, regardless of when the amounts are actually paid." Id. at 28399; see also id. at 38414 (codified at 31 C.F.R. § 30.9). The June Rule further clarified that a "golden parachute payment" included a payment due to a change in control. Id. at 28408 (codified at 31 C.F.R. § 30.1).

On June 24, 2009, Harvard terminated his employment, citing HRB's acquisition of Gateway Bank and requesting the golden parachute payment pursuant to the change in control provision in the Employment Agreement. After consulting with Treasury, HRB refused to make that payment.

B.     Material Proceedings Below

Harvard filed a breach of contract action against Shore Bank and HRB in the Circuit Court of the City of Norfolk. In Count I, Harvard alleged that HRB had breached the

---

[4] The statutory prohibition on golden parachute payments was amended and recodified at 12 U.S.C. § 5221(b)(3)(C). Hereinafter, citations to Section 111 of EESA refer to the amended version unless stated otherwise.

Employment Agreement by refusing to make the golden parachute payment. In Counts II through IV, he alleged that HRB had breached the Employment Agreement by refusing to pay his attorney's fees for the current breach of contract action, a declaratory judgment action previously filed in the circuit court by Harvard, and a declaratory judgment action previously filed in federal court by HRB.

HRB filed a plea in bar to Count I. In its plea in bar, HRB argued that the prohibition on golden parachute payments in EESA § 111, as implemented by the June Rule, barred it from paying Harvard pursuant to the Employment Agreement. In its answer, HRB asserted that federal law also barred it from paying the attorney's fees sought by Harvard. In response, Harvard argued that HRB could not assert EESA § 111, as implemented by the June Rule, as an affirmative defense to his breach of contract claim. Harvard asserted that if federal law barred HRB from making the golden parachute payment, then it would result in a taking of his contractual rights without just compensation, and therefore the prohibition was unenforceable as applied to him.

The circuit court overruled the plea in bar. The circuit court concluded that EESA § 111, as implemented by the June Rule, effected a taking without just compensation as applied to Harvard. Harvard v. Shore Bank, 88 Va. Cir. 204, 215 (Norfolk Cir. Ct. Apr. 30, 2014). Accordingly, HRB could not assert EESA § 111 and the June Rule as defenses at trial.

Subsequently, HRB argued that the circuit court lacked jurisdiction to award a remedy. In its view, if EESA § 111 and the June Rule constituted a taking as applied, then Harvard was required to bring a claim against the United States for just compensation in the United States Court of Federal Claims. The circuit court rejected HRB's argument and awarded Harvard $655,495.43 plus interest. Harvard v. Shore Bank, 89 Va. Cir. 328, 334 (2014) (Norfolk Cir. Ct.

6

Nov. 21, 2014).  The court also awarded Harvard his attorney's fees for the current breach of

contract action and the federal declaratory judgment action filed by HRB.  Id. at 336.  However,

the court found that HRB was not responsible for the fees incurred during the declaratory

judgment action filed by Harvard in the circuit court.  Id. at 335-36.

We granted HRB this appeal.

## II.  ANALYSIS

The parties and the United States, appearing as amicus curiae, have presented the dispute

as a question of constitutional interpretation: whether EESA § 111, as implemented by the June

Rule, effects a taking without just compensation, and thereby violates the Takings Clause of the

Fifth Amendment to the United States Constitution.  However, the case can be resolved

according to principles of contract law.  Consequently, we do not reach the takings claim.  See

Alexandria Redevelopment & Hous. Auth. v. Walker, 290 Va. 150, 156, 772 S.E.2d 297, 300

(2015) ("[W]e strive to decide cases on the 'best and narrowest grounds available.'") (citation

omitted).  We review questions of contract interpretation de novo.  Schuiling v. Harris, 286 Va.

187, 192, 747 S.E.2d 833, 836 (2013).

A.      Subject Matter Jurisdiction

We begin by addressing the question of subject matter jurisdiction raised by the parties.

HRB contends that, if EESA § 111, as implemented by the June Rule, effects a taking, then

Harvard's sole remedy is a claim for just compensation against the United States in the Court of

Federal Claims.[5]  The United States assures us that the takings claim is ripe for adjudication and

_____

[5] The Tucker Act confers upon the United States Court of Federal Claims exclusive
jurisdiction over any claim against the United States for damages exceeding $10,000 that is
"founded either upon the Constitution, or any Act of Congress or any regulation of an executive
department, or upon any express or implied contract with the United States, or for liquidated or
unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).

that we have jurisdiction over the claim because it is not one against the United States for money damages. However, when this case is distilled to its essence as a question of contract law, the basis for our jurisdiction thereunder is clear.

Harvard filed an action for the breach of a private contract. In response, HRB asserted EESA § 111 and the June Rule as an affirmative defense. To avoid HRB's defense, Harvard alleged that EESA § 111 and the June Rule effected an unconstitutional taking without just compensation. Certainly, we have jurisdiction over the breach of contract action, and we can apply federal law if necessary to resolve the dispute. See Merrell Dow Pharm., Inc. v. Thompson, 478 U.S. 804, 808 (1986) (the existence of a federal statutory defense generally does not create federal subject matter jurisdiction). Indeed, the United States District Court for the Eastern District of Virginia dismissed HRB's prior action for declaratory judgment because the case turned on a question of Virginia contract law, and the "mere fact that TARP is implicated" was insufficient to support the exercise of federal jurisdiction. Shore Bank v. Harvard, 934 F. Supp. 2d 827, 841 (E.D. Va. 2013). Although the dispute comes to us in a different posture, it still turns on a question of Virginia contract law, and we will resolve it accordingly.

B.      Impossibility of Performance

The defense of impossibility of performance is an established principle of contract law.[6] In Virginia, it is "well settled that where impossibility is due to domestic law, to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance, or to the fortuitous destruction or change in the character of something to which the contract related, or which by the terms of the contract was made a necessary means of

---

[6] Throughout these proceedings, HRB has asserted that it is "legally prohibited" from making the golden parachute payment to Harvard. We view HRB's argument as, in effect, invoking the defense of impossibility of performance due to supervening circumstances — in this case, a change in federal law.

8

performance, the promisor will be excused, unless he either expressly agreed in the contract to assume the risk of performance, whether possible or not, or the impossibility was due to his fault."  Housing Auth. of Bristol v. East Tennessee Light & Power Co., 183 Va. 64, 72, 31 S.E.2d 273, 276 (1944); see Restatement (Second) of Contracts §§ 261 & 264 (1981).[7]

Harvard does not dispute that EESA § 111, as implemented by the June Rule, directly bars HRB from making the severance payment to Harvard upon the termination of his employment, because the payment falls within the definition of a prohibited "golden parachute payment."  12 U.S.C. § 5221(a)(2); 31 C.F.R. § 30.1.  Moreover, Harvard does not suggest that HRB "expressly agreed in the contract to assume the risk of performance, whether possible or not."  Housing Auth. of Bristol, 183 Va. at 72, 31 S.E.2d at 276.  Nor could he; the amended Employment Agreement clearly places the risk of future changes in the law regulating golden parachute payments on Harvard.

On December 31, 2008, Harvard agreed that the Employment Agreement had been "amended to the extent necessary to give effect to Provision[] (1)," which prohibited HRB from "engaging in any golden parachute payment to [Harvard] during any [relevant timeframe]."  Harvard also agreed that:

> Provisions (1), (2), and (4) of this letter are intended to, and will be interpreted, administered and construed to, comply with Section 111 of EESA (and to the maximum extent consistent with the preceding, to permit operation of the Benefit Plans in accordance with their terms before giving effect to this letter).

---

[7] In the case of sales, a modern formulation of the defense is codified in Virginia's version of the Uniform Commercial Code.  Code § 8.2-615 provides that "[d]elay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be valid."

By its plain language, the amended Employment Agreement must be read to comply with EESA § 111. Nothing therein exempts the agreement from amendments to EESA § 111 by subsequent legislation or places the risk of performance in the face of subsequent legislation on HRB.

Further, HRB voluntarily chose to participate in TARP, and it did so with Harvard's full knowledge and acquiescence. Harvard does not dispute that he had notice of the TARP Agreement, which stated:

> [HRB] shall have effected such changes to its compensation, bonus, incentive and other benefit plans, arrangements and agreements (including golden parachute, severance, and employment agreements) (collectively, "Benefit Plans") with respect to its Senior Executive Officers . . . , as may be necessary, during the period that the Investor owns any debt or equity securities of the Company acquired pursuant to this Agreement or the Warrant, in order to comply with Section 111(b) of the Emergency Economic Stabilization Act of 2008 ("EESA") as implemented by guidance or regulation thereunder that has been issued and is in effect as of the Closing Date.

Section 5.3 expressly reserved Treasury's right to "unilaterally amend any provision of this Agreement to the extent required to comply with any changes after the Signing Date in applicable federal statutes." Pursuant to this section, Treasury could require HRB to make additional changes to its compensation packages (or refuse to make any prohibited payment) to comply with amendments to EESA § 111.

Finally, the rules of interpretation agreed upon by HRB and Treasury provide that "[e]xcept as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and in the case of statutes, include any rules and regulations promulgated under the statute)." Accordingly, the reference to any "regulation thereunder that has been issued and is in effect as of the Closing Date" must be interpreted to include any amendment, modification, or

10

supplementation to that regulation. The TARP Agreement clearly states that HRB must "take all necessary action to ensure its Benefit Plans" continue to comply with EESA § 111 and the regulations thereunder, even as amended. Accordingly, Harvard cannot contend he was unaware that Treasury could prevent HRB from making the golden parachute payment.

At best, the non-occurrence of a supervening amendment to EESA § 111 was a "basic assumption" on which both parties amended the Employment Agreement. See Restatement (Second) of Contracts §§ 261 cmt. b & 264 cmt. a. Certainly, Harvard can point to nothing in the record that would indicate HRB agreed to pay Harvard the golden parachute payment regardless of supervening amendments to EESA § 111.

Instead, Harvard attempted to mount a collateral attack on the constitutionality of EESA § 111, as amended by the June Rule. But the validity of the law rendering performance impossible does not affect the validity of the defense, provided the promisor relies upon the law in good faith. See White v. J.M. Brown Amusement Co., 601 S.E.2d 342, 345-46 (S.C. 2004) (holding that subsequent invalidation of a law did not revive a contract after the parties had ceased performing in good faith compliance with the law); Gaunt v. Shelter Mut. Ins. Co., 808 S.W.2d 401 (Mo. Ct. App. 1991) (holding that the respondent did not breach a settlement agreement by making payment pursuant to a lien that was subsequently declared invalid); Directions, Inc. v. New Prince Concrete Constr. Co., 491 A.2d 1347 (N.J. Sup. Ct. App. Div. 1985) (concluding that the appellant was not required to challenge an apparently valid administrative order to determine its validity before refusing to perform a contract).

There is nothing in the record that would suggest HRB refused to make the golden parachute payment in bad faith. After Harvard terminated his employment, HRB sought guidance from Treasury regarding its contractual obligation to make the disputed golden

11

parachute payment, and whether it could perform that obligation in light of EESA § 111, as implemented by the June Rule. In response, Treasury provided informal guidance indicating that HRB could not make the payment and comply with EESA § 111.[8] Where, as here, the government has clearly expressed its intent to enforce the law, and the promisor cannot in good faith perform its contractual obligation without violating the law, the promisor is discharged from its obligation. See Harriscom Svenska v. Harris Corp., 3 F.3d 576 (2d Cir. 1993) (finding that, in light of evidence that the government would not allow continued sales, the seller complied in good faith with the government's requirements and refused to perform its remaining obligations); Restatement (Second) of Contracts § 264 cmt. b.

This rule encourages parties to conduct their affairs under the law as it evolves, without requiring the promisor to mount expensive challenges to the validity of a law that apparently renders performance of a contractual provision impossible, or analyze the relative cost of penalties for noncompliance with a law on one hand and damages for breach of contract on the other. The rule also prevents parties from using private contract disputes to attack the validity of a law when, as here, the government is not a party and cannot be enjoined from enforcing the allegedly invalid law. See Finkel Outdoor Prods., Inc. v. Bell, 205 Va. 927, 929, 140 S.E.2d 695, 698 (1965) ("The defendant must be properly brought before the court, else there will be no jurisdiction over him and a judgment against him will be void.").[9]

---

[8] If HRB does not comply with EESA § 111, it will be exposed to significant civil and criminal penalties. See 18 U.S.C. § 1001; 31 C.F.R. §§ 30.15(c) & Apps. A-B.

[9] The Fifth Amendment applies to governmental actors, not private parties, and if a party believes that it has suffered an unconstitutional taking due to government action, then it must seek either damages from the government or an injunction against the government. See Yearsley v. W. A. Ross Constr. Co., 309 U.S. 18, 20-21 (1940) (noting that "there is no liability on the part of [a] contractor for executing [Congress'] will"); Eastern Enters. v. Apfel, 524 U.S. 498, 520-22 (1998) (plurality opinion) (holding that an injunction against the enforcement of a law

For these reasons, the circuit court erred when it ordered HRB to make the golden parachute payment despite the federal prohibition on such payments found in EESA § 111, and as implemented by the June Rule.

C.    Attorney's Fees

HRB argues that the attorney's fees awarded by the circuit court pursuant to Section 11 of the Employment Agreement are also barred by the prohibition on golden parachute payments. HRB contends this provision cannot be invoked unless a change in control occurs. Thus, it concludes the attorney's fees constitute a payment due to a change in control, and accordingly, a golden parachute payment.[10] We agree.

Section 11 of the Employment Agreement provides:

> Employer agrees to pay promptly as incurred, to the full extent permitted by law, all the legal fees and expenses which the Officer may reasonably incur as a result of any contest . . . brought by Employer, the Officer or others concerning the validity or enforceability of, or liability under, the Change in Control of Employer's Parent Company (as defined above) provision of this Agreement . . . .

The June Rule defines a "golden parachute payment" as

> any payment for the departure from a TARP recipient for any reason, or any payment due to a change in control of the TARP recipient . . . , except for payments for services performed or benefits accrued.

---

may be an appropriate remedy when "it cannot be said that monetary relief against the [g]overnment is an available remedy.").

[10] Harvard argues that HRB failed to preserve this alleged error, because it failed to provide the circuit court with a meaningful opportunity to rule on the argument. See Rule 5:25. However, the record shows HRB asserted in its answer that federal law prevented it from paying Harvard's attorney's fees, argued during the trial on damages that EESA § 111 and the June Rule barred it from paying Harvard's attorney's fees, and renewed its argument at the close of the evidence. The circuit court concluded that federal law could not bar these fees, because its ruling on the plea in bar precluded HRB from asserting federal law as a defense. For these reasons, we conclude that the issue has been preserved.

13

31 C.F.R. § 30.1. Under the June Rule, a payment, or a right to a payment, is treated as one "for services performed or benefits accrued only if the payment would be made regardless of whether the employee departs or the change in control event occurs, or if the payment is due upon the departure of the employee, regardless of whether the departure is voluntary or involuntary." Id.

Section 11 of the Employment Agreement clearly creates a right to a "payment." Further, the parties would only litigate "the validity or enforceability of, or liability under," the change in control provision if a change in control had occurred or was imminent. Thus, it cannot be said that Harvard's right to the payment of his attorney's fees would have accrued "regardless of whether . . . the change in control event occurs." 31 C.F.R. § 30.1. It follows that Harvard's right to the payment provided for in Section 11 accrues due to a change in control event. This fits the definition of a "golden parachute payment," and the exception for "payments for services performed or benefits accrued" does not preserve the award.

III.  CONCLUSION

For the foregoing reasons, we conclude that EESA § 111, as implemented by the June Rule, renders HRB's payment of the severance allowance impossible. Therefore, the circuit court erred in overruling the plea in bar. Because federal law prohibits the golden parachute payment under these circumstances, Section 3(b)(iii) of the Employment Agreement is void and unenforceable. Accordingly, we reverse the judgment of the circuit court and vacate the award of damages in favor of Harvard. Moreover, because federal law also bars any payment pursuant to Section 11 of the Employment Agreement, we also reverse the judgment of the circuit court with respect thereto and vacate the award of attorney's fees in favor of Harvard.

Reversed and final judgment.